**UNITED STATES**

v.

**Samuel R. LEPRESTI, Torpedoman's Mate First Class (E–6), U.S. Navy.**

**NMCM 97 01671.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 12 Nov. 1997.

Decided 7 Dec. 1999.

645

LCDR Robert C. Klant, JAGC, USN, Appellate Defense Counsel.

LT Albert L. Digiulio, JAGC, USNR, Appellate Defense Counsel.

LT Russell J. Verby, JAGC, USNR, Appellate Government Counsel.

CAPT Kent Stone, JAGC, USNR, Appellate Government Counsel.

LCDR Paul D. Lochner, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge, TROIDL, Senior Judge, and ROLPH, Appellate Military Judge.

DORMAN, Senior Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of larceny and forgery, in violation of Articles 121 and 123, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 923 (1994). The approved sentence includes confinement for 6 months, forfeiture of all pay and allowances, reduction to pay grade E–1, and a bad-conduct discharge. By his action of 26 January 1999, the convening authority

suspended "forfeiture of all pay and allowances, not exceeding $500 . . ." for a period of six months.

This is the second time this case has been before us. By our decision of 27 October 1998, we found the convening authority's action to be clearly incorrect and returned the record for preparation of a corrected action. That action has been completed and the record is once again before us for review, without the assignment of additional error. We have now carefully considered the record of trial, the appellant's assignments of error, and the Government's response.

Upon review, we have found error and will take corrective action. Following our corrective action, we conclude that the findings are now correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Upon reassessment of the sentence, we find that it is also correct in law and fact. Arts. 59(a) and 66(c), UCMJ.

### Facts

In November 1994, Mr. J.D. Anderson II, and appellant were both assigned to Fleet Training Center, Norfolk, Virginia, where they became good friends. Record at 319–20, 358, 372. On 22 May 1995, Mr. Anderson was medically discharged from the Navy. Following his discharge, Mr. Anderson packed his belongings into a rental van, and proceeded to clean his rented townhouse. He had the carpets cleaned on 25 May 1995, paying for the service by check. Prosecution Exhibit 19. With all his belongings moved out of his townhouse, he accepted the appellant's invitation to spend his last night in Virginia at the appellant's house. Record at 321, 380, and 538. That evening Mr. Anderson carried a "fanny pack" into the appellant's house. It contained some items of personal hygiene as well as Mr. Anderson's wallet and checkbook. He slept on the appellant's sofa that night, and placed the fanny pack on a coffee table in front of the sofa where he slept. *Id.* at 322–23, 380. The appellant went out that evening and Mr. Anderson heard him return home around 0200. Mr. Anderson then fell back to sleep. *Id.* at 324.

On the morning of 26 May 1995, the appellant awoke Mr. Anderson and shortly thereafter Mr. Anderson began the drive to his new home in Colorado. On the first day he drove to Indiana, where he stayed overnight with his parents. He then continued his trip to Colorado. *Id.* at 324, 538. After arriving in Colorado, he placed his belongings in storage, and then flew back to Indiana on 1 June 1995, where he remained for about six weeks. *Id.* at 324–25, 538. During his stay in Indiana, Mr. Anderson realized his checkbook was missing. He was unconcerned about his missing checkbook because he believed that it was stored with his belongings in Colorado. *Id.* at 325.

During mid-June 1995, Mr. Anderson became aware that two checks, numbers 1060 and 1061, in the amounts of $2,500 and $1,000, had cleared through his Navy Federal Credit Union (NFCU) account. Since he did not recall writing the checks, he asked NFCU to send him copies of the checks. *Id.* at 326, 329, 388.

After Mr. Anderson realized his checkbook was missing, he called the appellant from Indiana in order to see if he had left it at the appellant's home. The appellant claimed to have looked for the checkbook and then told Mr. Anderson that he did not find it. *Id.* at 330. Mr. Anderson called the appellant about a week and a half later, while the appellant was on leave in Pennsylvania. Mr. Anderson made this call after learning of some unauthorized credit card purchases on his charge account, and to again discuss the two checks. The appellant told him that he did not know anything about the transactions. Mr. Anderson also asked the appellant whether the appellant's roommate, "Lou," had seemingly come into some money. The appellant indicated that was not the case. The next day, the appellant called Mr. Anderson and told him that he thought Lou had used the appellant's checking account the same way he had used Mr. Anderson's, and that Lou had written a $900 check on the appellant's account which bounced. One day later, the appellant told Mr. Anderson that Lou had killed himself, and that Lou's mother had given the appellant power of attorney to sell Lou's belongings, and that the appel-

lant would use the money to pay Mr. Anderson for what Lou had done. When Mr. Anderson informed the appellant that NFCU was sending copies of the check numbers 1060 and 1061 to Mr. Anderson, the appellant told him that Lou might have put the appellant's name on the checks. *Id.* at 331–33, 399. A friend of the appellant's, Hospital Corpsman Second Class Griffin, testified that he saw Lou in October–November 1995, and that he had talked with him by phone in December of 1995. He had not heard of Lou killing himself. *Id.* at 486–87.

The evidence at trial revealed that Mr. Anderson's NFCU check number 1060, made payable to the appellant for $2,500 and dated 5 June 1995, was presented at the Naval Air Federal Credit Union [NAFCU] on 9 June 1995. It was processed and paid by NFCU on 12 June 1995. *Id.* at 465; Prosecution Exhibits 7 and 9. Additionally, NFCU check number 1061 was made payable to the appellant for $1,000. It was dated 17 June 1995 and was presented at NAFCU on 27 June. The appellant took leave from 12–25 June 1995 and visited with Mr. Anderson and his family in Indiana for several days during that leave period. Record at 331, 364, 523–25; Defense Exhibit A. On 28 June 1995, NFCU processed and paid the second check. Record at 464; Prosecution Exhibits 15 and 18. Although both checks are made out to "Samuel Lepresti," both are endorsed on the back with the signature, "Samuel R. Lepresti." The signature on the back of check number 1060 bears a striking resemblance to the appellant's signature on a stipulation of fact entered into the record during the case on the merits. Prosecution Exhibits 7 and 22.

In mid-June 1995, NFCU contacted Mr. Anderson to inform him of some abnormal charges on his credit card account. Record at 327, 388, 467; Prosecution Exhibits 3 and 24. On 27 June 1995, Mr. Anderson notified the Bank of New York of the fraudulent use of another one of his credit cards. *Id.* at 407; Prosecution Exhibits 1 and 2. The fraud included the purchase of auto parts of a total value of $728.70 from Quadratec on 9 June 1995, and shipped to the appellant on 12 June 1995. *Id.* at 416; Prosecution Exhibit 10. An exercise machine and an exercise video of a total value of $247.85 were purchased from Fingerhut Corporation on 6 June 1995, and shipped to the appellant on 9 and 14 June 1995 using Mr. Anderson's NFCU Visa credit card. *Id.* at 425–26; Prosecution Exhibits 3 and 11. Jeep equipment was purchased from a company called "4 West" on 6 June 1995 using Mr. Anderson's credit card. Part of the order totaling $375.05 was shipped to the appellant on 6 June 1995, and a back-ordered item valued at $190.17 was shipped to the appellant on 9 June 1995. *Id.* at 434; Prosecution Exhibits 12, 13, and 20.

The defense theory was that Mr. Anderson had written the checks and authorized the credit card purchases. In support of this position, HM2 Arturo Griffin was called as a defense witness and testified that he had known the appellant for 4–5 years and that he frequently worked out at his house with the appellant and Mr. Anderson. At the beginning of one work-out session, he heard Mr. Anderson tell the appellant that they could "work something out" so that the appellant could obtain the needed auto parts to repair a jeep he was working on. After one exercise session, HM2 Griffin observed Mr. Anderson give the appellant what HM2 Griffin believed was Mr. Anderson's forwarding address, as well as his credit card numbers, so the appellant could purchase the auto parts. *Id.* at 481–84, 491. The appellant asked Mr. Anderson, "What's this?", and Mr. Anderson said, "Order your parts and I'll take care of it." *Id.* at 483. HM2 Griffin believed that this conversation took place sometime between May and July 1995. *Id.* at 495.

Ms. Stacy Hurst, the appellant's sister, testified that she met Mr. Anderson four or five times when he and the appellant came to the restaurant where she worked during the early summer of 1995. *Id.* at 498–99. Around the end of May or first week in June 1995, Ms. Hurst observed Mr. Anderson write a check to her brother for $2,500 while they were at the restaurant. *Id.* at 500–01, 515. Ms. Hurst asked him why Mr. Anderson had written him the check, and the appellant told her that he had borrowed the money from Mr. Anderson. *Id.* at 507.

## Sufficiency of Evidence

■ In his first assignment of error, the appellant argues that the evidence of record was legally and factually insufficient to support his conviction with respect to both charges and all the supporting specifications. The test for legal sufficiency requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). With respect to the issue of legal sufficiency, we find the standard to have been met in this case.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). So, too, may we. Art. 66(c), UCMJ.

■ At the time of the thefts and forgeries, the appellant was in financial need. He thus had a motive to commit the offenses. While Mr. Anderson was sleeping following a hard day's work moving out of and cleaning his rented townhouse, the appellant had the opportunity to obtain Mr. Anderson's checks and credit card account numbers. Without equivocation, Mr. Anderson testified that he did not write the two checks in question and that he did not give the appellant permission to use his credit card numbers. Clearly the maker's signatures on the two checks match. Just as clearly, they are not the signatures of Mr. Anderson, nor are the checks written in the manner that Mr. Anderson routinely wrote out his checks.[1] *Compare* Prosecution Exhibits 7 and 15 *with* 19; *see also* Prosecution Exhibits 3, 8, and 17 (Mr. Anderson's signatures).[2]

Furthermore, we find it incredible that Mr. Anderson would have given the appellant several of his credit card numbers to purchase vehicle repair parts of an uncertain value, particularly when he did not think the appellant should be repairing the vehicle.[3] Additionally, there is no evidence of record suggesting that Mr. Anderson authorized the appellant to use his credit card number to purchase a piece of exercise equipment.

Finally, we note the appellant's apparent attempt to pass blame to his roommate, Lou. Not only did he tell Mr. Anderson that Lou may have put the appellant's name on the checks, but also that Lou had killed himself in the summer of 1995. The appellant's own friend and witness, HM2 Griffin, however, testified that he had seen and talked to Lou, long after the appellant told Mr. Anderson that Lou was dead. We consider the appellant's false statements concerning his roommate's suicide to be evidence of his consciousness of guilt of larceny. *See United States v. Colcol*, 16 M.J. 479, 483 (C.M.A. 1983); *United States v. Jones*, 34 M.J. 899, 909 (N.M.C.M.R.1992); *United States v. Elmore*, 31 M.J. 678, 684–85 (N.M.C.M.R.1990).

In resolving the question of factual sufficiency, we have carefully reviewed the record of trial, the briefs of counsel, and have given no deference to the factual determinations made at the trial level. Based on that review, we are convinced beyond a reasonable

1. Mr. Anderson also testified that he was familiar with the appellant's handwriting, and that in his opinion the handwriting on the checks was that of the appellant. Record at 336.

2. This physical evidence overwhelms the testimony of the appellant's sister that she saw Mr. Anderson write a check for $2,500 to the appellant. If in fact she saw such a check, it was not the check in issue in this case.

3. Mr. Anderson testified that he knew of the appellant's plans to repair his former girlfriend's jeep. Mr. Anderson did not understand why the appellant would work on the jeep however, because he did not think the girlfriend had treated the appellant very well. Record at 363, 393.

doubt of the appellant's guilt of both charges and all the supporting specifications.

### Jurisdiction

In his fourth and fifth assignments of error, the appellant challenges the authority of the Government to try him by court-martial. First, he argues that there was no jurisdiction over him because the Government did not take any official action with a view towards trial before the expiration of his enlistment. Next, he argues that jurisdiction does not exist because the Government unilaterally extended his enlistment for the purpose of maintaining court-martial jurisdiction. Both issues were raised at trial by a motion to dismiss. The rulings by the military judge denying the appellant's motions to dismiss involve mixed questions of law and fact. We thus review the findings of the military judge under a clearly erroneous standard and review his conclusions of law *de novo. See generally* S. Childress & M. Davis, 2 Federal Standards of Review §§ 7.01, 7.05 (2d ed.1992). Within that framework we have reviewed the findings of the military judge with respect to these two motions to dismiss and adopt them as our own. Record at 45–46; 132–134.

In summary format, we set forth the pertinent facts. The appellant was due to be discharged on 15 June 1995, his end of active obligated service. However, on the date he was to be discharged, he was still receiving treatment concerning an injury to his knee. In fact, the appellant was to be medically discharged due to that injury. On 28 June 1995, the appellant agreed to be extended on active duty in order to receive medical treatment. As his medical treatment and his medical board continued, an investigation was independently initiated concerning the charges of which he was eventually convicted. On 15 November 1995, he was involuntarily extended by his commanding officer pending resolution of the charges against him. Then on 6 December 1995, the Bureau of Naval Personnel authorized the appellant's discharge based upon a physical disability. That separation was held in abeyance by the appellant's commanding officer because of the appellant's legal hold status. At no time did the appellant ever receive a discharge certificate or a final accounting of pay. Under these facts, we find that the appellant was properly retained on active duty and that jurisdiction continued to exist to try him by court-martial. *United States v. Batchelder,* 41 M.J. 337 (C.M.A.1994); *United States v. Poole,* 30 M.J. 149 (C.M.A.1990); Art. 2(a)(1), UCMJ. Accordingly, we resolve the appellant's fourth and fifth assignments of error against him.

### Speedy Trial

In his third assignment of error the appellant argues that the military judge erred in denying his motion to dismiss based upon a denial of his right to a speedy trial under Rule for Courts-Martial 707, Manual for Courts-Martial, United States (1995 ed.). As with the previous motions, this issue was raised and denied at trial, and the military judge entered findings of fact. Record at 106–108. Indeed, the parties stipulated to most of the essential facts. Appellate Exhibit XIII. As with the motions addressed above, we review the military judge's decision denying the speedy trial motion under a dual standard. His factual determinations are reviewed under a clearly erroneous standard and his legal conclusions are reviewed *de novo.* We have reviewed the factual findings of the military judge and adopt them as our own. Record at 106–108, 154.

An accused is entitled to have charges dismissed under R.C.M. 707 if it takes more than 120 days to bring him to trial. For purposes of the rule, time begins to run on the earlier of the date charges are preferred or the date pretrial restraint is imposed, and it continues to run until the accused is arraigned. R.C.M. 707(b)(1). In this case the appellant was arraigned 111 days after preferral of charges.

The main thrust of the appellant's argument is that even though he was arraigned on day 111, the Government was not prepared to go forward with evidence. At arraignment the appellant, through his civilian counsel, informed the military judge that he would not be ready to proceed to trial until September 1995. In his findings, the military judge determined that the original trial counsel in the case was ready to try the case in July and that if the appellant had wanted

to go to trial earlier than September 1995, the Government could have accommodated that request. Record at 107–108. Furthermore, even if we were to find that the Government was not prepared to proceed to trial at the time the appellant was arraigned, that fact would not give rise to a denial of the appellant's right to a speedy trial. *United States v. Doty,* 51 M.J. 464 (1999). Accordingly, the appellant was not denied a speedy trial.

### Challenge For Cause

*The Facts*

During individual *voir dire,* a prospective court-member, CDR Guthe, stated, "I had someone steal one of my credit cards recently, but that was handled personally instead of going to court." Record at 260. A relative of the woman who cleaned CDR Guthe's house stole the card. Several items appeared on his credit card bill, and he confronted the person. The individual admitted taking the card and using it, and then reimbursed CDR Guthe for the charged items. The card was reported lost to the credit card company and the card was cancelled. *Id.*

In responding to questions by the trial defense counsel, CDR Guthe stated that the unsigned credit card was stolen about 9 months prior to the appellant's trial by his cleaning lady's niece. CDR Guthe was asked if his experience with the theft of his credit card "would make [him] unable to reach a fair decision in this case." He replied, "I think the only answer I can give you is, in that particular situation the person admitted to taking our credit card and—we resolved it without charging her or whatever, and I don't know how that will affect my decision in this case." *Id.* at 262. CDR Guthe further denied that he would convict the appellant based upon a "visceral reaction" to his own situation, and affirmed that he could give the appellant a fair trial and make his decision based solely on the evidence presented at trial. *Id.* at 262–63. He was also asked whether his experience might cause him to impose a harsher sentence if the appellant were convicted. CDR Guthe stated:

No, I could—the only thing I could express with respect to that is, that I did feel somewhat outraged at having somebody come into my house and take my credit card, and—but, I don't—I'm not sure it will affect my ability to—if—if—we—if there is a conviction, in deciding an appropriate punishment. I don't think it will affect my ability to make a decision on a— on a full range [of punishment options].

*Id.* at 263.

Upon questions by the military judge, CDR Guthe indicated that he could keep an open mind and that he could follow the instructions. He assured the military judge that he would be able to remain impartial and keep an open mind until all the evidence was in, even if the facts in the appellant's case turned out to be very close to the facts of his own case. *Id.* at 264.

The appellant challenged CDR Guthe for cause due to the "substantial similarity of the charges—or the act in his case to the alleged acts in this case. He testified that he doesn't know how that will affect him and that he felt outraged. He subsequently came around, but that was his initial impression." *Id.* at 293. The Government opposed the challenge noting that CDR Guthe did not pursue the matter through legal channels, rather, he settled it privately, that he stated that his experience would not impact his thought process, that he could follow the instructions, and that it would not affect him in sentencing. *Id.*

The military judge denied the challenge noting:

In regard to the senior member, the court, at first was concerned when it was revealed that he had a credit card stolen from he [sic] and his wife, and watched the demeanor of this witness very carefully and listened to all of his answers very carefully, and the court is absolutely convinced that this member will be fair and impartial also. He stated clearly he would follow the court's orders; when pointed out that he was using equivocal language a couple of times, he reassessed that, stated clearly that he would consider all the evidence here in court before he made his decision; in the same way on sentencing, he'd keep an absolute open mind until all the evidence was in and he would consider

the full range of punishment. The court does not find any preconceived ideas of Commander Guthe on findings, and no preconceived opinions on sentencing in this case, and the challenge for cause is denied.

*Id.* at 301. The defense then used its peremptory challenge against CDR Texley, noting, "but for the military judge's denial of challenge of Commander Guthe, the defense would have issued the peremptory challenge on Commander Guthe." *Id.* at 302. In exercising his peremptory challenge against CDR Texley, the appellant preserved the issue in accordance with R.C.M. 912(f)(4).

■ In his sixth assignment of error, the appellant argues that the military judge erred when he denied a defense challenge for cause against CDR Guthe. The only possible basis for causal challenge here is R.C.M. 912(f)(1)(N), a general proscription against membership where it would give rise to a "substantial doubt as to the legality, fairness and impartiality" of the proceedings. *Id.* Military judges are to liberally grant challenges for cause. A decision denying a challenge is reviewed for a clear abuse of discretion. *United States v. Giles*, 48 M.J. 60, 62 (1998) *citing United States v. White*, 36 M.J. 284, 287 (C.M.A.1993). Further, "[t]he burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3).

■ We must first determine whether the challenge is based upon actual or implied bias. Actual bias is a credibility issue and great deference is given to the determination of the military judge. *United States v. Daulton*, 45 M.J. 212, 217 (1996). "The test for actual bias is whether any bias 'is such that it will not yield to the evidence presented and the judge's instructions.'" *United States v. Napoleon*, 46 M.J. 279, 283 (1997)(quoting *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A.1987)). Implied bias, however, is viewed objectively, through the eyes of the public. The focus is on the appearance of fairness. *Id.* Given CDR Guthe's responses during *voir dire*, we see no issue of actual bias in this case. We will therefore apply the more demanding objective standard.

■ In applying that standard, we have reviewed the findings of the military judge and adopt them as our own. We find that the military judge did not err in denying the appellant's causal challenge of CDR Guthe. We make this finding in light of the private manner in which CDR Guthe resolved the theft and misuse of his own credit card, his assurances that he would consider all the evidence presented, his assurance that he would apply the law in accordance with the instructions given to him by the military judge, and his assurance that he had no preconceived notion as to an appropriate sentence. Accordingly, we reject the appellant's sixth assignment of error.

### Prior Conviction by Special Court–Martial

During its case on sentencing, the Government offered Prosecution Exhibit 25, a record of the appellant's conviction by special court-martial for violating Article 121, UCMJ, under R.C.M. 1001(b)(3)—"Evidence of prior convictions of the accused." Because the prior conviction occurred on 7 October 1982, the appellant objected to its admission, arguing that it should be excluded under the balancing test of Military Rule of Evidence 403, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). In response, the Government concurred that the balancing test of MIL.R.EVID. 403 was applicable, but that even under that test, the prior conviction should be admitted. Record at 620–23. The military judge admitted the exhibit after examining the analysis of R.C.M. 1001 contained in MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), App. 21, and after conducting the balancing under MIL.R.EVID. 403. Record at 632–33. The appellant then sought clarification from the military judge, arguing that MIL.R.EVID. 609, prohibits consideration of convictions that are more than 10 years old. The military judge noted that MIL.R.EVID. 609 is a rule of evidence concerning the impeachment of a witness by prior conviction of crime, and that Prosecution Exhibit 25 was not offered for impeachment purposes. Nevertheless, the military judge applied the balancing test under MIL. R.EVID. 609, and found that the probative value of the exhibit substantially outweighed

any prejudicial effect of the document, and once again ruled that Prosecution Exhibit 25 was admissible. Record at 633–35. We find that the military judge did not err.

 The decision by a military judge to admit evidence is reviewed for a clear abuse of discretion. *United States v. v. Zakaria,* 38 M.J. 280, 283 (C.M.A.1993); *United States v. Casey,* 45 M.J. 623, 626–27 (N.M.Ct. Crim.App.1996); *see also United States v. Clemente,* 50 M.J. 36, 37 (1999)(noting that "pre-sentencing evidence is limited by the R.C.M. 1001 rules and . . . Mil.R.Evid. 403.") Clearly the evidence of the appellant's prior conviction was offered by the Government as an appropriate matter for the sentencing authority to consider under R.C.M. 1001(3)(A). The military judge properly performed the MIL.R.EVID. 403 balancing test prior to admitting the evidence. Under that test, the age of the prior conviction in and of itself was not the determining factor. Rather, it was but one factor to be considered under MIL. R.EVID. 403. Another crucial factor that weighed in favor of admissibility is the fact that it was a conviction for an earlier violation of Article 121, UCMJ, the same Article of which the appellant had just been convicted. This directly relates to the appellant's rehabilitative potential. While MIL.R.EVID. 609(b) places limitations upon the admissibility of evidence of prior convictions that are over 10 years old, those limitations did not apply to the facts of this case because the evidence was not offered for impeachment purposes. The appellant's prior conviction was offered under R.C.M. 1001(b)(3), which does require a balancing test. By doing so in this case, the military judge afforded the appellant greater protection than was required. Accordingly, we find no merit in the appellant's seventh assignment of error.

### Larceny of Auto Parts

In his eighth assignment of error, the appellant argues that Specifications 4 and 6 of Charge I are multiplicious for findings purposes. He argues that the evidence estab-

lished that the items listed in both specifications, and allegedly stolen, were all ordered at the same time during a single phone call. Due to a back order by the company from which the items were ordered, the merchandise was delivered to the appellant on different dates. Thus, he argues, the two specifications allege "one simultaneous act of larceny." Appellant's Brief of 29 June 1998 at 18. While we do not find that the two specifications are multiplicious, we do find that the two specifications address a single continuing larceny.

The evidence established that at the time of the larceny the appellant was repairing an automobile for his former girlfriend. That project had come to a standstill because he needed to purchase some parts to complete the job. He also needed some extra money to make the purchases. Record at 482. Then, on the morning of 6 June 1995, a call was placed from the appellant's home to "4 West," an auto parts store. Prosecution Exhibit 13. During that call, an order was placed with "4 West" for several auto parts for delivery to the appellant's address. Record at 435; Prosecution Exhibit 12. All but one of the items ordered were shipped to the appellant's address on 6 June 1995. The remaining item was shipped on 9 June 1995. Record at 434–35; Prosecution Exhibit 20. These items were purchased using Mr. Anderson's Visa card number, and "4 West" was never paid for the merchandise. Record at 435, 438. This transaction was then alleged as two separate larcenies.[4]

The issue before us appears to be one of first impression. Neither the appellant nor the Government has cited any controlling case law on this issue. Both the appellant and the Government argue this issue as if it were one of multiplicity. In that regard, we find that the specifications are not multiplicious. Not only do we look to the statutory elements, but we also look to the pleadings to determine that issue. *United States v. Weymouth,* 43 M.J. 329, 333 (1995); *United States v. Teters,* 37 M.J. 370, 377 (C.M.A.

---

**4.** We do not fault the Government for charging this as two separate larcenies. The documentary evidence, Prosecution Exhibits 12 and 20, contain two different dates, and do not clearly indicate that the second shipment was a back-order. That information came to light through the testimony of the assistant manager of "4 West".

1993); *United States v. Ray,* 51 M.J. 511, 513 n. 4 (N.M.Ct.Crim.App.1999). Here, the elements are different because the Government is required to prove different facts with respect to each individual item stolen. Furthermore, the pleadings themselves set out the specific items allegedly stolen.

More is involved here, however. The Government correctly argues that a larceny is not complete until the thief takes, obtains, or withholds the property of another. Government Brief of 29 September 1998 at 33. That position is supported by cases such as *United States v. Hubbard,* 28 M.J. 203 (C.M.A.1989); *United States v. Seivers,* 8 M.J. 63 (C.M.A.1979); and *United States v. Dawson,* 50 M.J. 599 (N.M.Ct.Crim.App. 1999). In *Seivers,* our superior court examined a larceny by fraud from an insurance company, holding that the larceny continued, and was not completed, until after the accused had deposited the insurance check into his own account. The court analogized that situation to the type of credit card fraud we have in this case. *Seivers,* 8 M.J. at 65. Thus, the appellant's larceny of the car seat shipped on 9 June 1995 was part of the continuing larceny he set in motion by his phone order to "4 West" on 6 June.

We analogize this situation to BAQ fraud type cases. There the service member draws allowances to which he is not entitled over an extended period of time, either because of a single false claim of dependency or a failure to report a change in dependency. Routinely, those cases are charged as a larceny of the total amount of funds the service member fraudulently received. *See e.g. United States v. Helms,* 47 M.J. 1, 2 (1997); *United States v. Gray,* 44 M.J. 585, 587 (N.M.Ct.Crim.App.1996)(citing single larceny specifications of BAQ fraud extending over an 11 month period). Furthermore, where we have seen it charged as a new larceny each pay period, we have consolidated the specifications into a single offense. *United States v. Johnson,* 39 M.J. 707, 711 (N.M.C.M.R.1993). We took that action because we found the multiple specifications violated the policy that one transaction should not be made the basis for an unreasonable multiplication of charges. *Johnson,* 39 M.J. at 711; see R.C.M. 307(c)(4) Discussion.

Specifications 4 and 6 of Charge I, are not multiplicious, but they both allege a distinct part of the same larceny. The Manual for Courts–Martial addresses a similar situation.

> When a larceny of several articles is committed at substantially the same time and place, it is a single larceny even though the articles belonged to different persons. Thus, if a thief steals a suitcase containing the property of several persons or goes into a room and takes property belonging to various persons, there is but one larceny.

MCM, Part IV, ¶ 46c(1)(h)(ii). While not directly on point, the meaning is clear. The policy it expresses is consistent with our decision in *Johnson* and the Discussion following R.C.M. 307(c)(4). As a matter of policy, where a single act results in the theft of multiple items of personal property, only one larceny is to be charged.

Accordingly, we hold that a single larceny should be charged under the following facts: (1) An accused intends to steal several items; (2) The means of committing the larceny is through a single act of fraud; and, (3) The owner of the property delivers the items to the accused, but delivery is made at different times or dates. Applying this rationale to the case before us, we find consolidation appropriate. Under the principles announced in *United States v. Savage,* 50 M.J. 244 (1999), we find plain error. We will provide relief in our decretal paragraph.

### Instructional Error

The appellant alleges that prejudicial error resulted when the military judge denied a defense request to instruct the members concerning the collateral consequences of a punitive discharge upon the appellant's approved medical discharge and severance pay.[5] Appellant's Brief at 13. The Govern-

---

5. We have accurately summarized the appellant's

argument on this issue. We note, however, that

ment concedes that the appellant's proposed instruction was correct. The Government argues, however, that because the requested instruction was substantially covered by other instructions given, and because the failure to give the instruction did not hinder the appellant in the presentation of his case on sentencing, no error occurred. We find no error, but for reasons other than those advanced by the Government.

*Facts.* The appellant was due to be discharged on 15 June 1995, his end of active obligated service. However, on 28 June 1995, he agreed to be extended on active duty in order to receive medical treatment concerning an injury to his knee. Eventually the appellant was authorized a discharge for physical disability with a 10% disability rating and severance pay for his years of Navy service. A naval message, dated 6 December 1995, directed that he be separated within 10 days of its receipt. Appellate Exhibit X; Record at 647. That separation, however, was held in abeyance because the appellant was placed on "legal hold" on 15 November 1995, pending resolution of the charges against him.

Following sentencing arguments, the military judge instructed the members. His instructions did not address the collateral consequences of a punitive discharge on the appellant's approved medical discharge or severance pay. Neither the prosecution nor the defense objected to the instructions. The military judge then asked the members if there were any questions. Two members asked questions concerning the appellant's medical discharge. One member asked, "What effect does conviction or sentencing have on the pending medical discharge addressed in Defense Exhibit L?" Another member asked, "Is the member PO Lepriti (sic) authorize (sic) 10% disability?" Record at 664; Appellate Exhibits CXV and CXVI. As the military judge and counsel discussed these questions, the members withdrew to the deliberation room. The Government then objected to answering the questions, citing *United States v. Griffin*, 25 M.J. 423

(C.M.A.1988) and *United States v. Lee*, 43 M.J. 518 (A.F.Ct.Crim.App.1995). Record at 665.

The military judge invited counsel to consider the standard instruction concerning collateral effects of punishment contained in Appendix A–9 of the Navy–Marine Corps Trial Guide (January 1996). The Government preferred the standard instruction to a novel draft instruction. Record at 669. The military judge proposed an instruction that closely tracked the standard instruction. *Id.* The appellant proposed that the members be instructed, "You're advised that any punitive discharge awarded by this court will divest Petty Officer Lepresti of his approved medical severance pay for the 10% disability he has suffered." *Id.* at 670. The appellant also objected to the standard instruction concerning collateral consequences of sentencing as proposed by the military judge. *Id.* The military judge declined to give the requested instruction. The appellant then requested that the military judge re-emphasize that portion of the instructions that states that "a punitive discharge deprives one of substantially all benefits administered by—administered by the Department of Veterans Affairs and by the Department of the Navy...." *Id.* Because the members already had the written instructions, the military judge decided not to re-emphasize that portion of the instructions.

When the members returned the military judge instructed the members on this issue, as follows:

> The court answers the two questions by the members by stating that there are many administrative and practical effects that may result from a conviction or a particular punishment. And all effects are not predictable, and it would be speculative for me to instruct you on possible collateral effects. I'll elaborate on this some. Eligibility and approval of a medical discharge is an administrative process that's independent of this court-martial. It involves decisions by the chain of command, perhaps up through the Secretary of the

the member's questions did not specifically inquire about the impact of a punitive discharge on

the appellant's severance pay.

Navy. That is a collateral process that is not connected with this court-martial and the authorized punishments that you've been instructed that you may consider in this case .... from no punishment to the maximum punishment. I've provided you detailed information on each one of those punishments.

Now, I want to direct your attention back to the very first paragraph in my instructions. You're—you're advised that when you make your decision, you must adjudge a single sentence for all of the offenses. But more importantly, the sence be (sic)—the sentence behind that is, you must not adjudge an excessive sentence in reliance upon possible mitigating action by the convening or higher authority. In other words, you must assess the evidence in this case and award a sentence that you think is just for the evidence, not considering collateral consequences and not considering any possible mitigating action by anyone in higher authority. You should not award any sentence that's any higher than what you believe is necessary, disregarding all possible collateral consequences. Do the members understand that?

PRES: Yes, Your Honor.

MJ: An affirmative response by all the members. The last thing I should say here perhaps is that you should not at any time consider a harsher sentence in any way because of a particular collateral consequence. And, in fact, you should lean the other way. Do you understand that? (No verbal response from the members.) If there's any doubt about a collateral consequence in your mind, you should weigh that in the accused's favor, if you're going to think about that. Will the members be able to do that? An affirmative response from all the members. Are there any other questions from the members?

PRES: No questions, Your honor.

Record at 671–72. The appellant now argues, as he did at trial, that he had the right to the requested instruction and to have the members consider the collateral consequences of a sentence to a punitive discharge, as they related to his approved medical discharge, disability, and severance pay. We disagree.

■■■■ **Discussion.** We review a military judge's decision not to give a defense-requested instruction under an abuse of discretion standard. *United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A.1993). Furthermore, in determining whether there was error, we look to three factors. First, was the requested instruction correct? Second, is the requested instruction substantially covered in the instructions given? Third, does the instruction concern an issue that is so vital to the defense case, that the refusal to give the instruction would deprive the accused of the defense, or seriously impair its presentation? *Damatta–Olivera,* 37 M.J. at 478. Applying these standards we find that the military judge did not abuse his discretion in this case.

The first step in applying the *Damatta–Olivera* standards is to determine whether the requested instruction was correct. Under the facts of this case, we find that it was not.

■■■■ We start with the general rule that the sentencing authority at a court-martial should not be concerned with the collateral administrative consequences of a sentence. *United States v. Hall,* 46 M.J. 145, 146 (1997)(citing *United States v. McElroy,* 40 M.J. 368, 372 (C.M.A.1994)). Additionally, our superior court has made clear that the question of "[w]hether collateral-consequences instruction is appropriate in an individual case depends upon the particular facts of that case." *United States v. Greaves,* 46 M.J. 133, 139 (1997).

■■■■ The appellant relies on *Greaves* in support of his argument that the military judge erred in refusing to give the requested instruction. Appellant's Brief at 14. In *Greaves,* our superior court found prejudicial error where the military judge refused to instruct the members that a bad-conduct discharge would deprive Technical Sergeant [TSgt] Greaves of all his retirement benefits despite the members specifically asking what effect a bad-conduct discharge had on retirement. At the time of his trial, TSgt Greaves had 19 years and 10 months of service, and

would not have had to re-enlist prior to the vesting of his retirement benefits. As in the present case, TSgt Greaves' trial defense counsel did not waive the issue.

We do not find *Greaves* to be controlling precedent because it is factually distinguishable. There, the awarded punitive discharge clearly served to terminate TSgt Greaves' retirement benefits that would have vested in 2 months. In the appellant's case, he was to be discharged for a physical disability with a 10% disability rating. Additionally, he was due to receive severance pay based upon his 15–plus years of service in the Navy. As of the date of the appellant's court-martial, it could not be said or readily ascertained that a punitive discharge would clearly sever those benefits. Here, two members asked questions concerning the appellant's pending medical discharge and the percentage of disability. Although those questions were not directly answered, the instruction proposed by the appellant would not have correctly answered them.

The proposed instruction would have informed the members that any punitive discharge would have divested the appellant of his approved medical severance pay for the 10% disability he suffered. We have examined the authorities the appellant cites in support of this proposed instruction, and find that they do not factually support it. Appellant's Brief at 13. Our review of the applicable regulations leads us to the conclusion that the proposed instruction was wrong.

Title 10 of the U.S. Code mandates the service secretaries to prescribe and administer disability regulations. Specifically, "the Secretary concerned has all powers, functions, and duties incident to the determination under this chapter of the entitlement to, and payment of, disability severance pay to any member of an armed force under his jurisdiction." 10 U.S.C. § 1216(b)(4)(1989). The Secretary of the Navy has promulgated instructions that address these issues.

The Secretary of the Navy Instruction 1850.4D (23 Dec 1998) is presently the governing regulation on the administration of the disability program in the Department of the Navy. The instruction in effect at the time of the appellant's court-martial was SECNAVINST 1850.4C (22 Nov 1995). Both instructions contain identical language to the effect that "[d]isciplinary separation is not precluded by the disability statutes. Such separations as described herein normally supersede disability separation or retirement;" however, both instructions are silent on the specific issue of whether "disciplinary separation" necessarily results in the forfeiture of previously awarded disability severance pay. SECNAVINST 1850.4C at ¶ 2072; SECNAVINST 1850.4D at ¶ 3042. Both instructions indicate that, in the event disability evaluation occurs concurrent with or subsequent to disciplinary action, the "ultimate disposition shall be decided by the Assistant Secretary of the Navy Manpower and Reserve Affairs." [ASN(M & RA)]. *Id.*

Although the SECNAV instructions are silent concerning forfeiture, they both provide a listing of occurrences that render a member ineligible for disability benefits. A punitive discharge is not on this list. *See* SECNAVINST 1850.4C at ¶ 2075; SECNAVINST 1850.D at ¶ 3406. Therefore, in accordance with these regulations, a servicemember with an unexecuted bad-conduct discharge may be eligible for disability severance pay. Whether the servicemember will receive those benefits is within the discretion of the ASN(M & RA). Thus, based on our review of the applicable regulations the appellant has not met the first part of the *Damatta–Olivera* standard. A punitive discharge would not necessarily result in the appellant forfeiting his severance pay, or losing his medical disability.

We find that the facts of this case serve to highlight the value of the general rule that the sentencing authority should not be concerned with the collateral consequences of a particular sentence. *See United States v. Hall,* 46 M.J. 145, 146 (1997). This is particularly true where, as in this case, one can only speculate as to what the possible administrative or collateral consequences of the sentence might be. Such speculation does not promote truth in sentencing, and should be avoided. Also, ascertaining the full range and degree of administrative consequences, such as occurred in this case, will necessitate significant delays in the trial proceedings.

Since those consequences were speculative, we find no abuse of discretion and no instructional error in the manner by which the military judge addressed the questions posed by the two members.

## Ambiguity in the Action

In the appellant's 10th assignment of error, he alleges that the convening authority's [CA's] action is defective in two respects. First, the action suspending adjudged forfeitures is ambiguous. Second, the action concerning deferral of adjudged and automatic forfeitures is ambiguous. Appellant's Brief at 19. The Government concedes that the action is ambiguous. Government's Brief of 29 September 1998. We agree.

The post-trial review process in this case has been plagued by numerous errors indicating a lack of attention to detail and or ineffective communication between the various players, including this court. The first error occurred on 5 August 1997, when the Staff Judge Advocate [SJA] to the CA issued General Court–Martial Order [GCMO] No. 7–97, which purported to promulgate the results of the appellant's trial and the CA's action in this case. Among the errors in that order was the designation of the sentencing authority as the "military judge" vice members, and the inclusion of an action dated 5 August 1997, which relates to an entirely different Sailor. In fact, the CA had not yet acted in the appellant's case.

On 4 September 1997, the CA took action on the appellant's case. In that action, he approved the sentence as adjudged, but suspended "forfeiture of all pay and allowances, not exceeding $500 ..." for a period of 6 months. Then on 18 September 1997, the SJA issued Supplemental GCMO [SGCMO] No. 4–97. In that document he referred to the 5 August 1997 GCMO and made the following corrections: (1) noted that the sentence was adjudged by members; (2) noted that the action in the first CMO related to an entirely different Sailor; and, (3) replaced the other action with the actual action taken on 4 September 1997, except that it incorrectly indicated that the 4 September 1997 action was taken on 5 August 1997.

On 1 October 97 the appellant's trial defense counsel submitted a "Brief Challenging Convening Authority's Actions in the Instant Case" to this court. In that brief the trial defense counsel pointed out the deficiencies in the 5 August 1997 GCMO, but made no mention of the 4 September 1997 CA's Action or the 18 September 1997 SGCMO.

Two assignments of error related to this post-trial review process were briefed to us at the time of original submission by the appellate defense counsel. Assignment of Error IX asserted the various errors in the 5 August 1997 GCMO, and recognized that the CA actually took his action on 4 September 1997. No mention is made of the 18 September 1997 SGCMO. Assignment of Error X asserted that the 4 September 1997 CA's action was defective because the language relating to forfeitures was vague and ambiguous. The Government conceded both errors.

We issued a decision on 27 October 1998, in which we failed to recognize that the CA's action of the 4 September 1997 was attached to the record of trial. We also failed to recognize the existence of the SGCMO of 18 September 1997. Focusing on the CA's action that was attached to the GCMO of 5 August 1997, we found the CA's action to be clearly incorrect because it referred to a different individual than the appellant, and we returned it for the preparation of a new action. In our decision we did not discuss the language which the appellant claimed was vague and ambiguous. Upon return of the case to the CA, on 26 January 1999 he withdrew the action contained in the 5 August 1997 GCMO, failed to note the 4 September 1997 action or the 18 September 1997 SGCMO, and issued a new action. The new action is identical in language to the 4 September 1997 action, including the vague and ambiguous language relating to forfeitures.

Although we did not specifically address the ambiguity of the action, the ambiguity is obvious. In fact, the Government had conceded error before the case was sent back to the convening authority for correction. When provided with such an opportunity, convening authorities and staff judge advocates would be well served by reviewing the pleadings of appellate counsel and taking action to cure obvious errors identified by

counsel. In the interest of judicial economy we will direct corrective action in the decretal paragraph.

### The *Gorski* Issue

Citing *United States v. Gorski*, 47 M.J. 370 (1997), the appellant next alleges that he should not have been subjected to the provisions of Articles 57 and 58b, UCMJ, because his offenses were committed prior to the effective date of those provisions. The Government concurs, as do we. While the Government argues that the appellant is due relief only if the application of these provisions actually caused him to suffer a loss, the documentation before us clearly suggests that those provisions were enforced against the appellant. Indeed, the convening authority approved a request to defer $500, apparently per month, of automatic forfeitures, and directed that the money be paid to the appellant's wife "in satisfaction of ... court ordered child support...." Commander, Naval Base Norfolk Letter of 17 January 1997. We will provide relief in our decretal paragraph.

### Sentence Appropriateness

In his final assignment of error, the appellant summarily argues that a bad-conduct discharge was inappropriately severe in this case. He makes this argument because he claims that the discharge will deprive him of his medical discharge and his severance pay. As developed earlier in this opinion concerning the alleged instructional error, the appellant's argument is factually flawed.

A general court-martial is free to impose any legal sentence that it determines is appropriate. *United States v. Turner*, 14 C.M.A. 435, 437, 34 C.M.R. 215, 217 (1964); R.C.M. 1002. We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and [determine], on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Generally, sentence appropriateness should be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982)(quoting *United States v. Mamaluy*, 10 C.M.A. 102, 106–07, 27 C.M.R. 176, 180–81 (1959))(internal quotes omitted). Furthermore, appellate courts "should not disturb the sense of justice of the community where the crime was committed unless the harshness of the sentence is so disproportionate as to cry out for sentence equalization." *United States v. Usry*, 9 M.J. 701, 704 (N.C.M.R.1980). Applying these guidelines, we find that the inclusion of a bad-conduct discharge is appropriate in this case.

### Conclusion

Following our careful review of the record of trial, and the briefs of appellate counsel, the findings are affirmed with the following modification. Specifications 4 and 6 of Charge I are consolidated into a single specification which reads as follows:

In that Torpedoman's Mate First Class Samuel R. Lepresti, U.S. Navy, Fleet Training Center, Norfolk, Virginia, on active duty, did, at Norfolk, Virginia, on or about 6 June 1995, steal two Jeep seats, one console, and one Jeep rear seat, of a total value of about $565.22, the property of 4 West, the 4 Wheel Drive Store, Incorporated.

As a result of our action on the findings, we have reassessed the sentence in accordance with the principles of *United States v. Cook*, 48 M.J. 434 (1998), *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A.1990), and *United States v. Sales*, 22 M.J. 305, 307–08 (C.M.A.1986). Upon reassessment, and in consideration of the ambiguity contained in the convening authority's action, we approve that portion of the sentence that includes confinement for 6 months, forfeiture of $500 pay for one month, reduction to pay grade E–1, and a bad-conduct discharge. Prior to execution of the bad-conduct discharge, an appropriate convening authority shall restore to the appellant any pay, benefits or property of which he was deprived as a result of the misapplication of Articles 57(a) or 58b, UCMJ, to his case.

Senior Judge TROIDL and Judge ROLPH concur.