UNITED STATES

v.

**Roberto VALENTIN–NIEVES, Private First Class (E–2), U.S. Marine Corps.**

**NMCM 200000885.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 18 Nov. 1999.

Decided 27 Sept. 2002.

---

LT I.L. Paredes, JAGC, USNR, Appellate Defense Counsel.

LT Clarice B. Julka, JAGC, USNR, Appellate Government Counsel.

Before OLIVER, Senior Judge, VILLEMEZ and HARRIS, Appellate Military Judges.

HARRIS, Judge:

Following mixed pleas, Appellant was convicted of rape and false swearing, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934. A general court-martial panel consisting of officer members adjudged a sentence of confinement for 1 year, reduction to pay grade E–1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

We have carefully examined the record of trial, Appellant's two assignments of error, and the Government's response. We conclude that the findings and sentence as approved on review below are correct in law and fact and that no error materially prejudicial to the substantial rights of Appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Statement of Facts

From September through December 1998, Personnelman Seaman (PNSN) C, U.S. Navy, the victim, attended Personnelman "A" school at the Naval Technical Training Unit, Naval Air Station, Meridian, Mississippi. On 31 October 1998, PNSN C, Appellant, and others from the station rented rooms at the Motel 6 in town. That night, while partying in one of the rented rooms, PNSN C recalled drinking one beer and three mixed drinks in approximately 45 minutes. All three of the mixed drinks were made by other people including Appellant, and PNSN C recalled being told that the drinks contained "a lot of vodka." Record at 168.

After consuming the alcoholic beverages, PNSN C became very sick and returned alone to her room. In her room, Aviation Maintenance Administrationman Airman (AZAN) M. Garza, U.S. Navy, and Aviation Storekeeper Airman Apprentice (AKAA) J. Finkey, U.S. Navy, who were watching television, helped PNSN C lay down on the bed. Both AZAN Garza and AKAA Finkey described PNSN C as being "very intoxicated." *Id.* at 275, 314. A short while later, Appellant arrived at PNSC C's room. AZAN Garza then left the room, and Appellant, AKAA Finkey, and PNSN C remained in the room.

Shortly after Appellant arrived in her room PNSN C told him she was very drunk. PNSN C then told Appellant she wanted to take a shower, whereupon he told her that he would help her, and that "something might happen" if he removed her clothing in the bathroom. *Id.* at 318. When Appellant offered to help her, AKAA Finkey told him that was not a good idea, because Appellant was a male and PNSN C was female. Appellant told AKAA Finkey not to worry and said that he would take care of PNSN C. Appellant walked with PNSN C to the bathroom, nearly carrying her weight because "she could barely walk," and then shut the bathroom door. *Id.* at 319–20.

Inside the bathroom, PNSN C vomited. Appellant repeatedly asked PNSN C if she needed any help, to which she repeatedly responded "no." *Id.* at 172. PNSN C told Appellant she wanted to take a shower. Again, Appellant asked if she needed any help, and again PNSN C said "no." *Id.* Appellant then picked PNSN C up and started taking off her shirt. PNSN C tried to resist Appellant and told him that she "want[ed] to be alone," but she felt "very weak and very intoxicated and [she] didn't have the strength to [physically resist him]." *Id.* at 172–73. Appellant then took off PNSN C's shirt.

When Appellant unzipped her pants, PNSN C zipped them back up and told Appellant she did not need his help. Appellant again unzipped her pants because PNSN C did not have the strength to stop him. PNSN C testified that "[t]he only thing I

could do was tell him no that I didn't need his help." *Id.* at 174. PNSN C grabbed onto the sink counter because she felt very weak. While PNSN C was leaning on the sink counter for support, Appellant took off her panties and, while standing behind her, penetrated her vagina with his penis. When asked if she had resisted, PNSN C responded, "[t]here was nothing I could do. I had said no. I had said that I didn't need his help. I had told him to leave me alone and there was nothing else I could do. I didn't have the strength to push him away. I was too weak to hold myself up let alone hold someone else away." *Id.* at 176.

When Appellant left the bathroom, he told AKAA Finkey "[t]hat girl is pretty messed up." *Id.* at 321. A few minutes later, AZAN Garza returned to the room. AZAN Garza then went into the bathroom and saw PNSN C, naked, sitting in the shower, sobbing and still very drunk. AZAN Garza shut the bathroom door. While the two women were in the bathroom, Appellant paced outside the bathroom door and told AKAA Finkey something akin to "that girl's crazy." *Id.* at 322.

Inside the bathroom, PNSN C told AZAN Garza that Appellant had sex with her. AZAN Garza asked PNSN C if she had wanted to have sex with Appellant and PNSN C responded, "I don't know." *Id.* at 291. AZAN Garza left the bathroom to talk to Appellant.

After AZAN Garza left the bathroom, AKAA Finkey opened the door and asked if PNSN C was okay. AKAA Finkey saw that PNSN C was sitting naked in the shower and hugging her knees. AKAA Finkey then left the bathroom and closed the door.

When AZAN Garza asked Appellant whether he had sex with PNSN C, Appellant responded that he "wanted to ... f* * * her" but she "was drunk and I didn't know if she wanted it or not." *Id.* at 282. AZAN Garza then returned to the bathroom, found PNSN C still very intoxicated, and helped her get dressed. PNSN C then slept for some period of time between five and thirty minutes. When PNSN C woke up and heard her friends preparing to leave, she decided to go with them to a club. PNSN C testified that she was still staggering when she awoke

and the rape was the "farthest thing" from her mind. *Id.* at 181, 328.

Having arrived at the club before PNSN C, Appellant later saw her and told her that what went on in the bathroom was between them and no one else needed to know. PNSN C was still drunk and got sick again at the club. At the club, PNSN C danced for several hours. The testimony describing her interaction with Appellant at the club was inconsistent, ranging from dancing together with him in a group to pushing him away from her. *Id.* at 181–82, 285, 294, 329, 352.

When they returned from the club, PNSN C stayed in the room belonging to then Private First Class (PFC) B. Smith, U.S. Marine Corps. The testimony is inconsistent as to whether PNSN C stayed in PFC Smith's room because she could not get into her room or for other reasons. *Id.* at 183–84, 296, 330.

The next morning, 1 November 1998, Appellant again told PNSN C to not tell anyone about what happened. Later that day, PNSN C, AZAN Garza, Appellant, and others went swimming at the hotel pool. While swimming, PNSN C felt very uncomfortable and was beginning to understand what had happened to her. Also on 1 November 1998, while PNSN C was on the phone with her mother, she saw PFC Smith and Appellant walk by. After she called out to both of them to say hello to her mom, Appellant walked over, took the phone from her, and said "[hello]" to PNSN C's mother. *Id.* at 188.

For a few days after 31 October 1998, Appellant often asked PNSN C if they were still friends and would remind her not to tell anyone about what happened. On Thursday morning, 5 November 1998, during a conversation with AZAN M, the victim of an unrelated sexual assault allegedly committed by Appellant, PNSN C described what had happened to her and then asked AZAN M if that would be considered a rape. When AZAN M said what PNSN C described was rape, PNSN C started crying. PNSN C and AZAN M then went to talk to AZAN M's instructor, Staff Sergeant (SSgt) D. Evans, U.S. Marine Corps, to whom PNSN C re-

ported that she had been raped. When Appellant was told about the allegations made by PNSN C, and asked for a sworn statement by an investigator, he initially denied having sex with PNSN C because, as he later stated, he was "scared." *Id.* at 390–91. This was despite the fact that, according to Appellant and PFC Smith, PNSN C stated to them only a few days before the sexual intercourse that she "wouldn't mind having sex with [Appellant]" before he graduated. *Id.* at 374–75, 431, 451–53, 456.

Lieutenant Commander (LCDR) S. Talmadge, Jr., Medical Service Corps, U.S. Navy, testified on behalf of the Government as an expert witness in forensic psychology. He testified concerning the common reactions of a rape victim generally, that he wouldn't be surprised at any behavior. He explained that when a woman is raped her responses are highly individualistic. *Id.* at 252–53. LCDR Talmadge further testified that a victim of an "acquaintance rape" may not immediately realize that she was raped. *Id.* at 254.

AZAN M also testified regarding an incident that occurred on the way to the hotel office earlier in the day of 31 October 1998. While she and Appellant were walking over to the hotel office, Appellant allegedly reached over and grabbed her breast. In response to Appellant grabbing her, AZAN M slapped him and started to walk away. Shortly thereafter, Appellant also allegedly reached out and grabbed AZAN M's groin area. AZAN M became angry and slapped Appellant again and walked away from him, concluding that she "thought [she] handled it." *Id.* at 350.

### Prior Acts of Sexual Misconduct

■ Appellant contends that the military judge erred in admitting testimony, pursuant to Military Rule of Evidence 413, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), that he allegedly assaulted a third party, because the military judge's Mil. R. Evid. 403 balancing test was insufficient.

A military judge's evidentiary rulings are reviewed under an abuse of discretion standard. *United States v. Dewrell,* 55 M.J. 131, 137 (2001); *United States v. Manns,* 54 M.J. 164, 166 (2000). Mil. R. Evid. 413 states: "In a court-martial in which the accused is charged with an offense of sexual assault, evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." However, evidence offered under Mil. R. Evid. 413 must be subjected to a balancing test pursuant to Mil. R. Evid. 403. *United States v. Wright,* 53 M.J. 476, 482 (2000). Mil. R. Evid. 413 does not establish any particular preconditions for admissibility, other than that the accused is charged with a sexual assault, evidence that the accused committed a different sexual assault, and prior notice to the accused of the Government's intent to offer evidence of the other sexual assault. If those conditions are met, then the evidence "is admissible and may be considered for its bearing on any matter to which it is relevant," Mil. R. Evid. 413, provided also that the evidence is relevant under Mil. R. Evid. 401 and 402. *See Wright,* 53 M.J. at 482. While Appellant acknowledges that the military judge did perform a balancing test under Mil R. Evid. 403, he contends it was inadequate in light of *Wright* and *United States v. Enjady,* 134 F.3d 1427 (10th Cir. 1998), *cert. denied,* 525 U.S. 887, 119 S.Ct. 202, 142 L.Ed.2d 165 (1998).

When reviewing a decision to admit evidence under Mil. R. Evid. 413, "the [Mil. R. Evid.] 403 balancing test is to be applied in a broad manner which favors admission." *United States v. Dewrell,* 52 M.J. 601, 609 (A.F.Ct.Crim.App.1999); *accord Wright,* 53 M.J. at 482. Our superior Court has also detailed "[s]ome of the factors to be examined when conducting a balancing test" for Mil. R. Evid. 413 evidence under MIL. R. EVID. 403.[1] *Wright,* 53 M.J. at 482 (citing *Enjady,* 134 F.3d at 1433 and *United States v. Guardia,* 135 F.3d 1326, 1331 (10th Cir. 1998)). The Court of Appeals for the Armed

---

1. Strength of proof of prior act-conviction versus gossip; probative weight of evidence; potential for less prejudicial evidence; distraction of factfinder; and time needed for proof of prior conduct. Some others include: temporal proximity; frequency of the acts; presence or lack of intervening circumstances; and relationship between the parties.

Forces has held that the *Wright* factors are "neither exclusive nor exhaustive." *Dewrell*, 55 M.J. at 138.

In the case at hand, the military judge, after conducting a balancing test, properly admitted AN M's testimony that early in the day on 31 October 1998, Appellant had grabbed her breast and groin area. *Id.* at 347–49. In his ruling on Appellant's motion to suppress this evidence, the military judge articulated the balancing test that he applied:

> The admission of [AZAN] M's testimony is relevant under [Mil. R. Evid.] 402. It is also, admittedly, prejudicial to the accused. That is the nature of any Government evidence. The critical question is whether, for the purposes of [Mil. R. Evid.] 403, the probative value of the evidence is substantially outweighed by its prejudicial effect. I believe it is not.
>
> The testimony of [AZAN] M relates to offenses that, in comparison to the charge of rape, are relatively minor in nature. While on the stand during the motion phase, [AZAN] M appeared to be a strong, competent person who was more angered and disgusted by the accused's alleged behavior than anything else. Her testimony was straight forward and devoid of the supercharged emotions that can sometimes attend such testimony. There is little danger that the members will be so inflamed by the details of the uncharged assault that they will abandon their role as impartial factfinders and assume the accused committed the more egregious offense of rape. In addition, unless there is an objection from defense, the impact of the evidence admitted under [Mil. R. Evid.] 413 will be tempered by an instruction to the members that her testimony is admissible only to show the accused's propensity, if any, to commit sexual assaults. They will be further advised that such a showing does not diminish the government's burden to prove beyond a reasonable doubt, that the accused's act of sexual intercourse with the alleged victim in this case was done without her consent.

Appellate Exhibit VIII at 2. In his analysis, the military judge properly evaluated the evidence under Mil. R. Evid. 413 and 403,

made his required findings, and did not abuse his discretion in concluding that the evidence was admissible. *See Dewrell*, 55 M.J. at 137–38; *see also United States v. Roberts*, 55 M.J. 724, 728–30 (N.M.Ct.Crim. App.2001), *review den'd*, 56 M.J. 467 (2002). Therefore, we conclude Appellant's assignment of error is without merit.

### Sufficiency of the Evidence

Appellant further assigns as error that the evidence is both legally and factually insufficient to establish rape because PNSN C was capable of manifesting her non-consent and she acquiesced to sexual intercourse with him. Appellant's Brief of 31 Jul 2001 at 9.

The tests for determining legal and factual sufficiency are, respectively, "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt," *United States v. Turner*, 25 M.J. 324, 324 (C.M.A.1987)(citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), and whether, "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of [this Court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. Further, in exercising the duty imposed by this "awesome, plenary *de novo* power," this Court may judge the credibility of witnesses, determine controverted questions of fact, and substitute its judgment for that of the military judge, or court-martial members. *United States v. Cole*, 31 M.J. 270, 272 (C.M.A.1990).

In making factual determinations, we are guided by the principle that:

> Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). So, too, may we. Art. 66(c), UCMJ.

*United States v. Lepresti*, 52 M.J. 644, 648 (N.M.Ct.Crim.App.1999). It is with these

standards of review that we now examine the evidence adduced in this case.

With respect to the offense of rape, there are but two elements: An accused committed an act of sexual intercourse and the sexual intercourse was done by force and without the consent of the victim. MANUAL FOR COURTS MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 45b(1). We note that there is ample evidence of the act of sexual intercourse. Therefore, the issue that we must resolve is whether there was lack of consent. In defining the nature of the act, the Manual for Courts–Martial explains that:

> Consent ... may not be inferred ... where the victim is unable to resist because of the lack of mental or physical faculties. In such a case there is no consent and the force involved in penetration will suffice. All the surrounding circumstances are to be considered in determining whether a victim gave consent....

*Id.* at ¶ 45c(1)(b). Applying the above standards of review and being cognizant of the guidance contained in the Manual concerning the issue of consent, we find the evidence factually sufficient to sustain Appellant's conviction for rape.

 Appellant's argument as to the issue of consent hinges on the respective credibility of the prosecution witnesses (primarily PNSN C) and Appellant. Appellant points to various inconsistencies in the prosecution witnesses' testimony. However, we conclude that whatever inconsistencies do exist are relatively minor in nature and cannot lead to the conclusion that no rational factfinder could find guilt based upon the evidence admitted at trial. We ourselves are convinced beyond a reasonable doubt that PNSN C did not consent and that sexual intercourse occurred by force. We reject Appellant's assertion that his use of force—only that required for penetration—was not sufficient to establish the offense of rape. Where a victim is unable to resist, because of the lack of mental or physical faculties, there is no consent and the force involved in penetration will suffice. In this case, the victim's incapacity was due to her extreme intoxication, which was clearly known to Appellant and which was at least partly caused by him. *See*

MCM, Part IV, ¶ 45c(1)(b)(where accused knows of victim's unsound mind or unconsciousness to an extent rendering him or her incapable of giving consent, the act is rape).

■ While Appellant avers that he may have possessed an honest mistake of fact, we conclude that the evidence establishes that any mistake of fact, honest or otherwise, could not have been reasonable. *See, e.g., United States v. Yarborough,* 39 M.J. 563, 564–65 (A.C.M.R.1994). The fact that PNSN C arguably may have stated only a few days before the rape that she "wouldn't mind having sex with [Appellant]" before he graduated, does not equate to consent to sexual intercourse on the particular night in question, despite Appellant's supposed mistaken belief. The evidence of rape is both legally and factually sufficient, and Appellant's assignment of error is without merit.

### Conclusion

Accordingly, we affirm the findings of guilty and the sentence, as approved on review below.

Senior Judge OLIVER and Judge VILLEMEZ, concur.