**UNITED STATES**

v.

**Carson L. ALLEN, Jr., Staff Sergeant (E–6), U.S. Marine Corps.**

NMCM 9800849.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 21 May 1997.

Decided 30 July 2003.

Capt Curtis M. Allen, USMC, Appellate Defense Counsel.

LT Timothy E. Curley, JAGC, USNR, Appellate Government Counsel.

Before PRICE, Senior Judge, VILLEMEZ, Appellate Military Judge and CARVER, Senior Judge.

VILLEMEZ, Judge:

The appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, the members found the appellant guilty of maiming and assault with intent to commit grievous bodily harm in violation of Articles 124 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 924 and 928. On 21 May 1997, the appellant was sentenced to confinement for 12 months, forfeiture of all pay and allowances, reduction to pay grade E–1, and a bad-conduct discharge. On 13 March 1998, the convening authority approved the sentence as adjudged and, except for the bad-conduct discharge, ordered it executed. The convening authority deferred automatic and adjudged forfeitures, suspended adjudged forfeitures for 12 months, and waived automatic forfeitures for a period of 6 months.

We have carefully reviewed the record of trial, the appellant's 10 assignments of error, the Government's response and the appellant's reply brief. Except as specifically noted below, we conclude that the findings and sentence are correct in law and fact and that no error was committed that is materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Assignments of Error (AOE)

The Appellant's Brief and Assignments of Error of 12 July 1999 contains the following assignments of error:

I. THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE A STATEMENT BY APPELLANT THAT WAS DERIVED FROM STATEMENTS MADE UNDER A GRANT OF IMMUNITY.

II. THE DECISION TO PROSECUTE WAS IMPROPERLY BASED UPON STATEMENTS MADE BY APPELLANT PURSUANT TO A GRANT OF IMMUNITY; UP UNTIL THE TIME APPELLANT MADE THE STATEMENT, HIS WIFE WAS THE PRIMARY SUSPECT AND APPELLANT WAS STILL NOTED AS BEING AN EXCELLENT PARENT.

III. THE TESTIMONY OF MAJOR PETERMANN, USA; MAJOR PEDERSEN, USA; LIEUTENANT COMMANDER DULLY, USN; AND CAPTAIN CRAIG, USN, WAS IMPROPER, BECAUSE THEIR OPINIONS WERE BASED UPON APPELLANT'S IMMUNIZED STATEMENT.

IV. THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE A STATEMENT BY APPELLANT BECAUSE THE STATEMENT WAS THE PRODUCT OF AN ILLEGAL APPREHENSION BY COLONEL JACKSON.

V. THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE A STATEMENT BY APPELLANT BECAUSE ALTHOUGH SPECIAL AGENT WARSHAWSKY KNEW THAT APPELLANT HAD AN ATTORNEY, THE STATEMENT WAS OBTAINED WITHOUT NOTIFYING APPELLANT'S ATTORNEY.

VI. THE MILITARY JUDGE ERRED IN ACCEPTING TRIAL COUNSEL'S

REASON FOR PEREMPTORILY CHALLENGING A MEMBER OF THE SAME RACE AS APPELLANT.

VII. APPELLANT WAS DENIED HIS RIGHT TO A CONFLICT–FREE DEFENSE COUNSEL WHEN THE MILITARY JUDGE FAILED TO SECURE A WAIVER THAT WAS VOLUNTARY, KNOWING, INTELLIGENT, AND DONE WITH SUFFICIENT AWARENESS OF THE RELEVANT CIRCUMSTANCES AND LIKELY CONSEQUENCES.

VIII. THIS COURT SHOULD DISMISS CHARGE II AND ITS SOLE SPECIFICATION, AND CHARGE III AND ITS SOLE SPECIFICATION, BECAUSE THEY ARE AN UNREASONABLE MULTIPLICATION OF CHARGES IN VIOLATION OF R.C.M. 307(C)(4).[1]

IX. THE GOVERNMENT'S FAILURE TO PROVIDE DOCUMENTS AND WITNESSES TO THE DEFENSE DEPRIVED APPELLANT OF A FAIR TRIAL.

X.A. THE EVIDENCE IS FACTUALLY AND LEGALLY INSUFFICIENT TO PROVE CHARGE I, MAIMING, BEYOND A REASONABLE DOUBT.

B. THE EVIDENCE IS FACTUALLY AND LEGALLY INSUFFICIENT TO PROVE CHARGE II, AGGRAVATED ASSAULT, BEYOND A REASONABLE DOUBT.

### Facts

In March 1996, the appellant and his wife were the parents of CJ, a 3–month old child. CJ and his mother visited family in the Maryland area in early 1996, returning to Hawaii and rejoining the appellant on 6 March. A few hours after their return, CJ became ill and was taken to the Kapiolani Medical Center by the appellant and his wife. The appellant reported to medical personnel that CJ had gone limp, his legs stiffened, he had difficulty breathing, and he appeared dazed. The child was found to have two subdural and subarachnoid hemorrhages and retinal hemorrhages in both eyes. CJ was diagnosed as suffering from "shaken-baby syndrome" and admitted to the hospital. As it was initially thought that the injuries occurred at a time when the child was with his mother and away from the appellant, Mrs. Allen was originally suspected as the perpetrator of the abuse of CJ.

Due to the nature of the injuries, an action was instituted in the Family Court of the state of Hawaii. CJ was initially placed in a foster home and then placed back in the home with the appellant, with the condition that Mrs. Allen not be with the child unsupervised. The Family Court also ordered both parents to participate in counseling with a therapist, Ms. Wong, M.A. The Family Court invoked the protections of Hawaii Revised Code § 587–42(a), which provides that statements made by parties in a child protective proceeding—that would otherwise be unavailable—may be ordered by the Court to be inadmissible as evidence in any other state civil or criminal action. The Allens participated in this counseling through August of 1996.

The state of Hawaii, Department of Human Services (DHS), Child Protective Services (CPS) began an investigation. A Suspected Child Abuse and Neglect (SCAN) team was formed, the purpose of which was to protect CJ and to take action consistent with his best interests. The Allens hired an attorney to represent them in the state proceedings. At about the same time, a Naval Criminal Investigative Service (NCIS) investigation was also initiated. However, based on the preliminary medical information then available, NCIS concluded the offense most likely occurred in Baltimore, Maryland, during Mrs. Allen's visit there with the baby. Thus, on 14 May 1996, NCIS closed the case in Hawaii, transferring it to NCIS Resident

---

1. While in his brief the appellant indicates that "Charge III and its sole specification" (actually the Additional Charge, which alleges an assault on 6–7 March 1996) is an unreasonable multiplication of charges with Charge II and its sole specification (assault on 7–8 August 1996), it is clear from the brief that he means that Charge II and its sole specification (assault on 7–8 August 1996) is an unreasonable multiplication of charges with Charge I (maiming on 7–8 August 1996).

Agency, Annapolis, Maryland, to provide any needed investigative assistance to local civilian authorities. At this point, the appellant was no longer a suspect for purposes of court-martial prosecution.

Until early August, the appellant continued as the only custodial parent in the family home, with Mrs. Allen visiting with the child under his supervision. On August 8, 1996, CJ was brought back to the hospital by the appellant in serious condition. He was not breathing properly, and he was found to have a fractured skull, subdural hematoma, retinal hemorrhages in both eyes, a subgaleal hematoma and a subarachnoid hemorrhage. The appellant indicated that CJ had arched his back and fallen out of the appellant's arms to the floor.

As a result of this re-injury of CJ, the NCIS investigation was reopened. Special Agent (SA) Warshawsky took over the investigation. He participated in a search of the appellant's home. Another NCIS special agent, SA Hamilton, attempted to interview the appellant and his wife at the hospital. The Allens refused to answer questions until they had an opportunity to speak with their civilian attorney. NCIS also participated in the SCAN team proceedings, specifically those that occurred on 14 August 1996.

At the SCAN meeting on 14 August, Colonel (Col) Jackson, the appellant's supervisor,[2] and SA Warshawsky were present when the SCAN team met and confronted the Allens, who were accompanied by their legal counsel. They were advised that the medical professionals believed CJ's injuries were not consistent with an accidental event. The injuries, they believed, were consistent with an intentional act, a violent shaking of the child. As a result of the investigation leading up to this SCAN meeting, together with the information garnered by the agent at the meeting on 14 August, it became clear to SA Warshaw-

sky that the appellant was the primary suspect as to both the March and the August injury incidents. The critical piece of information revealed at the SCAN meeting that seemed to cause this change in focus for the agent, was the realization that the medical professionals estimated that CJ's original injuries had occurred within zero to 24 hours before he became symptomatic, and not much earlier as was first estimated. This information apparently clarified an earlier misunderstanding as to the timing of the effects that seemed to rule out the appellant as a suspect.

Immediately following the 14 August SCAN meeting, Col Jackson had a discussion with the appellant, advising him of the full extent of the evidence that had been developed against him. Col Jackson told the appellant that most of those involved in the case were convinced that CJ had been abused and that if CJ died, the appellant might be facing murder charges. The appellant made no inculpatory statements in response, other than to reiterate that his son had fallen from his arms.

The next day, 15 August, the appellant met Ms. Wong, the therapist with whom he and Mrs. Allen were undergoing counseling. During this meeting, the appellant told Ms. Wong that he had a dream about his son and when he awoke he was actually shaking his son. Ms. Reeber from DHS, CPS was contacted after this disclosure. Ms. Reeber spoke with the appellant over the telephone advising him to talk to his attorney and that anything he did say was *not* confidential and would be shared. She did not advise him of his rights pursuant to Article 31, UCMJ, 10 U.S.C. § 831, or *Miranda*.[3] The appellant then reiterated to Ms. Reeber his dream and the shaking of his son.

Following the disclosure to Ms. Wong and prior to the appellant's conversation with Ms.

---

2. Col Jackson is a Marine Corps Reservist, who was on active duty for several weeks in the summer of 1996. Due to the nature of Col Jackson's billet, he had previously served active-duty periods of various lengths of time in the position, in which he was the appellant's supervisor. Thus, he had come to develop a fairly close working relationship with the appellant over a period of time. During CJ's August 1996 hospi-

talization, Col Jackson visited the appellant several times at the hospital to see how the baby was doing and to be able to keep the command apprised on the situation. Record at 725–39; 2363–67.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Reeber, Ms. Wong contacted Staff Sergeant (SSgt) Walker, a friend of the appellant, so that the appellant would have a friend with him. SSgt Walker came to Ms. Wong's office, as a friend, and not in any official capacity. SSgt Walker did not advise the appellant of his Article 31, UCMJ, rights. The appellant told SSgt Walker that CJ's fall and injuries were all his fault. He told SSgt Walker that he had a bad dream and that when he woke up, he freaked, grabbed CJ and shook him. At SSgt Walker's request, using a doll that was in the room, the appellant demonstrated what he did to CJ. The appellant indicated that he was making this disclosure due to the new information that was revealed about the timing of the symptoms in relation to the injury. The appellant then realized that it was not a dream and that he had actually shaken his son.

The appellant said he wanted to turn himself in to NCIS that night and did not want to wait until the next morning, despite SSgt Walker's offer to spend the night with him. SSgt Walker advised the appellant not to talk to anyone until the appellant received more advice. The appellant continued to talk about the incidents. SSgt Walker then contacted Col Jackson, who arrived at Ms. Wong's office some minutes later. In the meantime, the appellant continued to give a telephonic statement to someone at CPS, ostensibly Ms. Reeber, as discussed above.

Col Jackson arrived at Ms. Wong's office thinking that the appellant was so upset that he might be contemplating suicide. SSgt Walker advised Col Jackson of the events and revelations of the evening and that the appellant wanted to turn himself in to NCIS. Col Jackson then put himself in a position where he could hear the appellant and Ms. Wong, but could not be seen by the appellant. Col Jackson heard enough to assure himself that the appellant was not suicidal. He then went into the room and told the appellant it was time to go. It was Col Jackson's intention to turn the appellant over to the military police.[4] The appellant asked

to speak to his wife before going to the police. Accordingly, Col Jackson took the appellant to the home of Master Gunnery Sergeant (MGySgt) and Mrs. Ward, family friends, where Mrs. Allen was at the time.

At the Ward's house, the appellant spoke with his wife. He also gave SSgt Walker the keys to his house, so that SSgt Walker could retrieve the NCIS special agent's business card from the appellant's home, so the investigating agent could be contacted. SSgt Walker got the phone number and NCIS was called. Everyone at the Ward home waited for the chaplain, who had been summoned. While waiting, the appellant told Col Jackson about his dream and his shaking of CJ a number of times. Upon his arrival, the appellant spoke with the chaplain. All those that were assembled then said a prayer, and Col Jackson took the appellant to NCIS.

At the NCIS office, SA Warshawsky asked the appellant if he had been forced or coerced into coming to the office. The appellant indicated that he had not been, and that he was there voluntarily. SA Warshawsky then asked the appellant if his lawyer knew that he was at the NCIS office. The appellant answered that he did not. SA Warshawsky proceeded to advise the appellant of his rights under Article 31, UCMJ. This particular advisement contained a cleansing warning, which notified the appellant that any prior illegal or improperly obtained statements or other evidence could not be used against him. This acknowledgement of rights was explained to the appellant in writing and verbally by SA Warshawsky.

Following this notification of rights, the appellant waived his rights and, over the course of approximately 3 hours, provided SA Warshawsky a lengthy and detailed statement. In pertinent part, the appellant indicated that, after having a bad dream one night, he woke up, picked up his son, held him tightly, and startled him. CJ began to cry loudly and then got louder and louder. In response, the appellant shook CJ by push-

---

4. The military judge concluded that at the moment Col Jackson escorted the appellant out of Ms. Wong's office on the evening of 15 August 1996, the appellant was in custody. Additionally, the military judge concluded that all the state-ments the appellant made to Col Jackson thereafter that evening were made in violation of the appellant's rights under Article 31, UCMJ. Record at 1346–48.

ing him back and forth with his hands. CJ's head snapped back and forth about three or four times. The appellant also reiterated that he had accidentally dropped CJ the morning after this bad dream and the shaking of CJ.

The appellant's prosecution at a general court-martial followed. Additional facts, necessary for the disposition of certain assignments of error, are discussed below.

## AOE I

### State Granted Immunity and Appellant's NCIS Statement

The appellant's first assignment of error asserts that the military judge erred by admitting into evidence a statement he made to an NCIS agent. He claims the statement was derived from other statements he made under a "grant of immunity." We disagree.

The Government may not use evidence obtained as the result of a grant of immunity. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). This proscription is founded upon the constitutional safeguards against self-incrimination. As the Supreme Court stated:

> We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination and therefore is sufficient to compel testimony over a claim of privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of penalties affixed to ... criminal acts." Immunity from the use of compelled testimony, as well as the evidence derived directly or indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using

the compelled testimony in *any* respect. . . .

*Id.* at 453, 92 S.Ct. 1653 (footnote omitted).

■ Once the issue of use of immunized testimony has been raised by an accused, the burden is on the Government to demonstrate that the evidence it wishes to use is not tainted by the immunized testimony. *Id.* at 460, 92 S.Ct. 1653. It is incumbent upon the Government not simply to negate the taint of the immunized testimony. "[R]ather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* See also *United States v. Olivero*, 39 M.J. 246, 249 (C.M.A.1994).

■ Thus, our threshold consideration is whether the statement made by the appellant to the NCIS special agent was a "compelled" statement made under a grant of immunity. Quite clearly, the appellant's statement was not compelled under a grant of immunity. The appellant and his wife were in the midst of a Child Protective Act (CPA) proceeding due to the injuries sustained by their child. Hawaii Revised Statute § 587–42(a) grants testimonial immunity to individuals for any statements that they make in connection with CPA proceedings. Appellate Exhibit 75(sic) at 24. The record clearly demonstrates that the NCIS special agent who took the statement from the appellant was neither working on, nor had any connection with, the State of Hawaii's CPA proceedings. SA Warshawsky was an NCIS special agent, assigned to conduct a criminal investigation into an alleged child abuse matter involving the appellant's son. He was a criminal investigator, not a counselor or state social worker. Thus, the statement was not compelled under the grant of immunity, inasmuch as it clearly was not given to a CPA agent, nor was it given as a part of the state CPA proceeding.

■ The second consideration is whether it was derived from that proceeding and therefore a compelled statement subject to suppression. It is not disputed that the appellant's 15 August 1996 statement to Ms. Wong, his therapist, fell within the ambit of the immunity statute. The statement to the

NCIS special agent certainly followed, that is, came after the immunized statement made to Ms. Wong. But was the NCIS statement later that day **derived** from that immunized statement? Without citation to legal authority or the record, the appellant asserts that, but for the immunized statement to his therapist, the appellant would not have given a statement to NCIS. The argument seems to be that since the NCIS statement followed the immunized statement, it, therefore, must be derived from the statement. This is a leap of logic this Court is not willing to take. A review of the record as to what transpired between the time the appellant gave his statement to the therapist and the time he spoke with the NCIS special agent is necessary.

First, we note that this is not a case in which the authorities were lacking suspects and the investigation only turned to the accused *after* he provided an immunized statement implicating himself. Prior to the time the appellant made the immunized statement, he clearly was a suspect in the investigation of his son's injuries. Prior to the events of early August, the appellant's wife was the primary suspect as to the abuse of CJ. However, after 8 August, when the child was again brought to the hospital due to injuries he had sustained while in the appellant's custody, the focus of those concerned about the child began to shift toward the appellant.

As of 8 August, 6 days prior to the appellant's statement, his home had been searched. On 14 August, a SCAN meeting was held concerning CJ's injuries, at which the appellant and his wife met with doctors, social workers, counselors, and investigators, including the NCIS special agent who would later take the appellant's statement. The Allens, as well as the NCIS investigator, were advised that CJ's injuries were consistent with the violent shaking of the child or shaken-baby syndrome. They were also advised that the injuries were intentionally caused. At this meeting, the interviewing agent was advised that the appellant's explanation for the injuries was not consistent with the injuries the child had sustained. In fact, the day prior to taking the appellant's statement, it had become clear to Special Agent Warshawsky that the appellant was the prime suspect in the injury/abuse of his son. That the investigating agent would attempt to interview the prime suspect—the appellant—was not only probable, it was a near-certainty. In his brief, the appellant questions the military judge's reference to an "inevitable interview" test. This is not so much a new test or axiom, as it is a common-sense recognition that an investigating agency undoubtedly will attempt, in the course of any investigation, to interview the primary suspect.

Between the time the appellant made the immunized statement to his therapist and the time he gave the statement to the NCIS special agent, the following occurred:

(1) The appellant spoke with Ms. Reeber, an employee of the State of Hawaii DHS, CPS, who advised him that anything he told her was not confidential and that she would have to share it with everyone. Ms. Reeber also advised the appellant that he should speak with his lawyer. Despite these warnings, the appellant made a statement to Ms. Reeber.

(2) At the request of Ms. Wong, the appellant's friend, SSgt Walker, came to be with and comfort the appellant at Ms. Wong's office. Upon his arrival, the appellant admitted to SSgt Walker that everything was his fault. The appellant told SSgt Walker he wanted to turn himself in that night, 15 August. SSgt Walker advised him to go home and relax and offered to go with him. The appellant told SSgt Walker that he did not want to return home, but, rather, he wanted to turn himself in that night.

(3) Col Jackson arrived at Ms. Wong's office, and was advised of the general nature of what had transpired. Col Jackson discussed with the appellant the matter of CJ's injuries and how they had occurred. The appellant told Col Jackson that, following the SCAN meeting the day before and his discussion with the colonel thereafter, he realized he had himself injured his son. Neither the discussions after the SCAN meeting, nor those the day of the confession were preceded by an Article 31, UCMJ, warning.

(4) The appellant left the therapist's office and was taken to MGySgt Ward's house by Col Jackson. At the Ward home, the appellant again told his friend SSgt Walker that he was going to turn himself in.

(5) At the Ward home, the appellant continued to talk with SSgt Walker and Col Jackson. He also spoke with a chaplain who had been called and came to the Ward's house. The appellant gave SSgt Walker the keys to his house, so that SSgt Walker could get the contact phone number for the NCIS special agent out of the appellant's home. The appellant seemed determined to turn himself in.

(6) The appellant was then taken to the NCIS office at his own request and insistence. At the office he was met by SA Warshawsky, who immediately asked the appellant if he had been forced, coerced, or ordered to appear at the NCIS office. The appellant responded that he was there voluntarily, and that he wanted to clear the air. SA Warshawsky then gave the appellant a "cleansing" Article 31, UCMJ, warning.

This cleansing warning included a specific provision that "any prior illegal admission or other improperly obtained evidence which incriminated me cannot be used against me in a trial by court-martial." SA Warshawsky specifically advised the appellant "that anything he had said prior to coming down here, could not and would not be used against him." The appellant then gave SA Warshawsky a lengthy and detailed statement.

These actions are noteworthy, because they represent significant breaks or interruptions in the chain of events between the time of the immunized statement to Ms. Wong and the time of the NCIS statement. They are the basis for the military judge's determination that the appellant's NCIS confession was wholly independent of the appellant's earlier immunized statement. Between the time of the appellant's immunized statement to his therapist and the statement to the SA Warshawsky, there had not only been a considerable passage of time, but also there had been a complete change in the place, the people involved, and the setting. There was a complete break from a one-on-one therapeutic setting with his counselor, to a friend's home surrounded by people who cared for him, and then finally to a custodial environment.

This break in time, setting, and personnel involved, as well as being given a cleansing warning prior to giving his statement to NCIS, convinces us that the appellant's NCIS statement is sufficiently independent of the earlier immunized statement. We are satisfied that the proper separation showing has been made under *Kastigar*.

## AOE II

### Decision to Prosecute Appellant Improperly Based on His Immunized Statement

The appellant contends the findings of guilty should be set aside, because the decision to prosecute him was based improperly on his immunized statements. We conclude the issue was forfeited. Even if it was not forfeited, the record does not support the appellant's contention.

■ The appellant is correct that *Kastigar*, as cited above, and its progeny not only prohibit the use of immunization statements in a prosecution, but also proscribes the non-testimonial use of immunized statements. *United States v. Kimble*, 33 M.J. 284, 291 (C.M.A.1991). This prohibition includes the decision to prosecute. *Id.* In a case in which an accused claims the improper use of an immunized statement in initiating a prosecution, the Government "may only proceed 'if the Government shows, by a preponderance of the evidence, that the … decision to prosecute was untainted by' the immunized witness' testimony." *Olivero*, 39 M.J. at 249 (citing *Cunningham v. Gilevich*, 36 M.J. 94, 102 (C.M.A.1992)). This requirement, however, presupposes that the Government has been put on notice of the claim of improper use of evidence and actually has an opportunity to sustain the burden of showing it was properly initiated.

■ RULE FOR COURTS–MARTIAL 907(b)(2)(D)(ii), MANUAL FOR COURTS–MARTIAL, UNITED STATES (1995 ed.) includes as a waivable basis for dismissal of offenses, pros-

ecutions barred by immunity from prosecution. Thus, if not raised at trial, an immunity-barred basis for dismissal is forfeited. This statutory authority is consistent with the discussions in decisional authority. As our superior Court has stated:

An accused that has testified under a grant of immunity may require the Government to demonstrate that it has not used information or evidence derived from his immunized testimony. However, as cogently explained by the Court of Military Review, the accused must assert his right in order to place this burden on the Government. Only then must the Government show "that there evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *United States v. Gardner*, 22 M.J. 28, 30 (C.M.A.1986), quoting *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972), which, in turn, quoted *Murphy v. Waterfront Commission*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964). Absent some defense complaint, there is no reason to protract a trial by requiring the prosecution to establish a negative—namely, that it has not used information or evidence derived from the accused's immunized testimony.

*United States v. Lucas*, 25 M.J. 9, 10 (C.M.A. 1987).

In this case, the Government did not have the opportunity to attempt to prove the negative. It had no notice that the appellant sought dismissal, due to alleged use of immunized testimony. Therefore, it had no chance to prove that its case stood on evidence untainted by immunized testimony. The appellant's reliance on *United States v. Youngman*, 48 M.J. 123 (C.A.A.F.1998) is misplaced. The accused in *Youngman*, in fact, did raise the issue at court-martial. He did not raise it at the Article 32, UCMJ, investigation. Our superior Court (CAAF) declined to find the failure to raise it at the Article 32, UCMJ, stage of the proceedings to constitute waiver, in light of the fact that it was raised at trial. *Id.* at 128–29. In this case it was not raised, nor was a *Kastigar* hearing requested.

Assuming *arguendo* that it was fairly raised by the appellant at trial, we find that the Government sustained its burden of showing an independent basis for the appellant's prosecution. We also rely on the following facts and analysis.

The day before the appellant made his immunized statement to Ms. Wong, a SCAN meeting was held. At that meeting the medical professionals stated very clearly that the injuries CJ sustained were not accidental. Specifically, they indicated that CJ's injuries were not consistent with the story that the appellant was telling about the child falling out of his arms. They indicated that abuse of CJ was the most likely cause of his injuries. At the conclusion of the meeting, it was clear to Col Jackson, who was in attendance, that if a jury was listening to these doctors, the appellant was going to need a good lawyer. He felt strongly enough about it that he took the appellant aside after the meeting and told him that if CJ died he would need a good lawyer. SA Warshawsky also attended this SCAN meeting. He too indicated that the evidence at that point led him to believe that the appellant was the primary suspect.

This is not a case where the crime had not been discovered until the accused's immunized testimony. Nor is it a case where there were no leads as to who committed the crime until the accused made a statement. The appellant was the primary suspect *before* he made the immunized statement. While the decision had not been made to prosecute the appellant as of the date he made the statement, the investigation was certainly going in that direction. After hearing all the information that had been amassed at the SCAN meeting the day before the appellant's immunized statement, Col Jackson firmly believed that the appellant was going to need a good lawyer and told him so. The prosecution of the appellant at that point appeared inevitable. His statement may have affected the timing of the prosecution, but it did not cause it to occur. The claimed error is without merit.

## AOE III

### Testimony of Four Medical Professionals Improper

■ Related to the previous assignments of error, the appellant's next claimed error

asserts that the use of the testimony of four medical professionals was improper, as their opinions were based on the appellant's immunized statement. This assignment of error is set forth in summary fashion, without citation to the record. As authority, the appellant again cites *Youngman,* 48 M.J. at 123. This claim of error, for the reasons discussed above and below, is without merit.

Unlike the accused in *Youngman,* the appellant did not raise this issue at court-martial. While the appellant made numerous requests for suppression of evidence, with multiple bases for the exclusion of evidence or witnesses, he did not move the court-martial to suppress the testimony of these witnesses based on the allegation that their testimony was tainted by immunized statements. The appellant's motions do not cite immunity-tainted influence as a basis for suppression. Nor did the appellant object to the Government calling the four witnesses complained of herein. Record at 1842 (Petermann); 1971 (Pedersen); 2162 (Dully); 2737 (Craig). The appellant cannot now complain that the Government acted improperly, without having first given the Government notice and an opportunity to address the issue. *Lucas,* 25 M.J. at 9–10. Even if we were to regard the issue as fairly raised by the defense, there is no error.

The four medical professionals were: Major (Maj) Peterman, MC, USA, who was the Chief of Neuroradiology at Tripler Army Medical Center (Tripler); Maj Pedersen, MC, USA, a child neurologist at Tripler; Lieutenant Commander (LCDR) Dully, MC, USN, a staff pediatrician at Naval Hospital, Camp Pendleton, who testified as an expert witness in pediatrics, child abuse and neglect; and Captain (CAPT) Craig, MC, USN, a Department of Defense consultant for cases involving child abuse and neglect, who testified as an expert witness in pediatrics and child abuse.

Majors Peterman and Pedersen were both part of the team of doctors who either treated or were consulted during the course of CJ's care. In general terms, they both testified that CJ's injuries were consistent with abuse of the child. Their opinions were not arrived at due to the appellant's statements.

Rather, they were opinions born out of medical evidence. Noteworthy in this regard is that both doctors were present at the SCAN meeting on 14 August, the day before the appellant made any statement. At this meeting, it was the conclusion of all the professionals involved that CJ had been abused, and that this abuse was the cause of his injuries.

Maj Pedersen indicated that he suspected CJ had been abused from the first time he spoke with the appellant and his wife. This occurred long before the appellant's statement on 16 August. Moreover, it was Maj Pedersen's opinion that the appellant's statement as to how the injuries may have occurred was not consistent with the injuries he had observed. It is hard to imagine how Maj Pedersen's opinions were based improperly on the appellant's immunized statement, when his opinion as to the cause of CJ's injuries was contrary to the appellant's statement.

As for Maj Peterman, he reached the same conclusion as did the other medical professionals as to causation of CJ's injuries. Maj Peterman, in fact, did not even see the appellant's statement until he was testifying at trial. The appellant's statement can hardly be said to have influenced Maj Peterman's testimony or opinion, when he was not privy to it during his direct testimony. It is noteworthy that when Maj Peterman did review the appellant's statement on the witness stand, he then indicated that the appellant's version of what occurred was **not consistent** with his professional opinion as to how CJ's injuries had occurred. Again, it is hard to imagine how Maj Peterman's opinion was tainted, or somehow influenced by the appellant's statement, when his opinion and the statement are entirely inconsistent with each other.

As for LCDR Dully, she also indicated that the injuries suffered by CJ were not caused accidentally and were most likely the result of shaken-baby syndrome. Her opinion was based on the child's medical record and her knowledge, training and experience as a doctor. LCDR Dully had not seen the appellant's statement before the trial. Thus, there is no support for the claim that her opinion

was somehow tainted by the appellant's statements.

Lastly, as for Captain Craig, she too opined that CJ's injuries were the direct result of shaken-baby or shaken-impact syndrome. This opinion was based upon the constellation of symptoms and physical findings. CAPT Craig did not mention that the appellant's statements played any part in her diagnosis or testimony, although she did testify that the appellant's description of CJ's head snapping back and forth was consistent with shaken-baby syndrome.

Having reviewed the record to determine what, if any, exposure to, or influence, the appellant's immunized statements may have had on witnesses, we are satisfied that the use of the testimony from these four medical professionals against the appellant was not tainted by any immunized statement he might have made.

## AOE IV

### Appellant's NCIS Statement Is The Product Of An Illegal Apprehension

█ In his fourth assignment of error, the appellant asserts that his statement to NCIS should be inadmissible, because it was the product of an illegal apprehension. The appellant is in error; his apprehension was not illegal.

Statements obtained as a result of an illegal arrest will be excluded as the "fruit" of the illegal arrest. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). An arrest not supported by probable cause is illegal. *Id.* "Probable cause to apprehend exists when there are reasonable grounds to believe that an offense had been or is being committed and the person to be apprehended committed or is committing it." R.C.M. 302(c). Probable cause for apprehension is a higher degree of certainty than the mere suspicion that triggers the obligation to inform the suspect of his rights per Article 31, UCMJ. *United States v. Schneider*, 14 M.J. 189, 193–94 (C.M.A.1982). It is not proof beyond a reasonable doubt. "It 'exists where

"the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been committed.' " *Id.* at 194 (citations omitted).

The military judge concluded that from the time Col Jackson summoned the appellant out of his conference with Ms. Wong on the evening of 15 August 1996, the appellant was in custody. The critical inquiry is whether Col Jackson had reasonably trustworthy information, sufficient to warrant a reasonable person to believe that an offense had been committed and that the appellant had committed it. We answer the question in the affirmative. Col Jackson, as the appellant's supervisor, had been kept abreast of information concerning the appellant's health and family issues. He had background information that the appellant's son had been injured in March and then again in August 1996. He knew that Mrs. Allen had initially been identified as the most likely perpetrator of the March injuries and was living outside of the home. He knew that CJ had been injured again in early August and had been hospitalized. He was also aware that NCIS was investigating the circumstances surrounding CJ's injuries.

Col Jackson attended the SCAN meeting on 14 August, with all the medical and other professionals involved in the Allen child's case. At this meeting, he was made aware of the severity of CJ's injuries. He learned that the general opinion of all the medical professionals was that CJ's injuries had been caused by shaking. In the opinion of the doctors, the injuries were not consistent with the appellant's explanation as to how CJ was injured (*i.e.*, the child falling out of his arms to the ground). Rather, they were consistent with abuse of the child. Following this meeting, Col Jackson felt so strongly about the state of the evidence against the appellant, he spoke to the appellant very frankly about his concerns. In describing his actions after this meeting, Col Jackson stated:

> I called him and we walked out of the room and I immediately started looking for a place where we could talk privately....

I felt at that time, he needed to know that there was a lot more evidence, a lot more incriminating statements that were made about him and possibly his wife at the first session than what he heard and that he better be prepared. There was evidence or information that was given that led me to believe that this wasn't going to be just an accident. If his son died, they would probably bring murder charges against him.

Record at 744. Quite clearly, Col Jackson believed that there was reasonable cause to believe the appellant had committed an offense. While we may question the wisdom of a supervisor having a "private" conversation with a subordinate he suspects of a crime, we do not question his evaluation and assessment of the evidence before him.

Col Jackson knew the child had sustained life-threatening injuries. These injuries had most recently occurred when the child apparently was in the appellant's sole care. The appellant had made numerous statements to doctors and others as to how these injuries had occurred. These explanations were entirely inconsistent with the nature and extent of the injuries, according to the consensus of medical opinion as to how they had occurred. These inconsistencies would give credence to the belief that the appellant was hiding something of an incriminating nature. We find that this constitutes probable cause to believe the appellant had committed an assault offense of some kind against his son. That being the case, Col Jackson's apprehension of the appellant the day following this SCAN meeting was not illegal, even without consideration of the statements the appellant made the next day.

## AOE V

### NCIS Improperly Obtained Appellant's Statement Without Notifying His Civilian Attorney

In his fifth assignment of error, the appellant asserts the military judge erred by admitting his statement to SA Warshawsky, which was obtained without first notifying his counsel of the interview. This claim of error is based on the purported violation of the appellant's rights under the Fifth and Sixth Amendments of the Constitution and Article 27, UCMJ, 10 U.S.C. § 827. As the appellant's statement, obtained prior to the preferral of charges, was initiated by the appellant and not by the interviewing special agent, and it was preceded by the appellant being advised of his Article 31(b), UCMJ, rights, receiving a cleansing warning, and then affirmatively waiving those rights, we find this assignment lacks merit.

The appellant suggests that under Article 27, UCMJ, he had a statutory right to have counsel present for questioning, based on language in the case of *United States v. McOmber*, 1 M.J. 380, 383 (C.M.A.1976). However, to the extent an inference could be drawn that our superior Court had based a right on this Article, the Court subsequently made it clear that the holding in *McOmber* case was not based on Article 27, UCMJ. In *United States v. LeMasters*, 39 M.J. 490, 492 n. * (C.M.A.1994), the Court indicated that the *McOmber* decision, prohibiting police initiated re-interrogation of an accused after invocation of his right to counsel, could not be reasonably based on Article 27, UCMJ. Thus, no substantial right under that Article was denied the appellant per that provision.

■ As to the appellant's right to counsel under the Sixth Amendment, that right is offense-specific and attaches at or after the time adversarial proceedings have been initiated. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "In the military, this sixth-amendment right to counsel does not attach until preferral of charges." *United States v. Wattenbarger*, 21 M.J. 41, 43 (C.M.A.1985).

■ The appellant made his statement to the SA Warshawsky on 15 August. Charges were not preferred against the appellant until 26 August 1996. His Sixth Amendment right to counsel had not yet attached. MIL. R. EVID. 305(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Those rights, therefore, could not have been violated.

■ The appellant next claims his 15 August statement was taken in violation of his Fifth Amendment right to counsel. At the

time of the NCIS interview, the appellant was represented by counsel in conjunction with the state's child-protection proceeding. The interviewing special agent, SA Warshawsky, knew this. He was also aware that the appellant had previously invoked his right to counsel and declined to discuss the matter with NCIS without counsel present.

SA Warshawsky's interview of the appellant on 15 August 1996, 7 days after he had invoked his right to counsel, came about as a result of the appellant's repeated requests to speak with SA Warshawsky, not vice versa. The appellant indicated that he wanted to "clear the air." The record establishes that the appellant, not the authorities, initiated the NCIS interview, which subsequently resulted in his statement.

Aware of the fact that other statements had been made that evening and that the appellant had counsel, SA Warchawsky sought legal advice as to how best to proceed with the interview before meeting with the appellant. Given the circumstances, SA Warchawsky prepared an Article 31(b), UCMJ, warning that included a cleansing warning. This warning contained not only an advisement that his prior statements could not be used against him, but also notification that he had the right to consult with a lawyer prior to any questioning. It also specifically advised him that he had the right to have his retained lawyer present. *Id.* SA Warshawsky reviewed this rights acknowledgement with the appellant. The appellant acknowledged that he had been advised of all his rights, including the right to have counsel present and waived those rights. Only then was the appellant interviewed.

It is clear that once an individual has invoked his right to counsel, questioning by an investigator must cease and the police may initiate no further interrogation unless counsel is present. *Minnick v. Mississippi,* 498 U.S. 146, 147, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). However, the Supreme Court also stated, "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." *Id.* at 156, 111 S.Ct. 486; *see also* MIL. R. EVID.

305(g)(2)(B). Similarly, our superior Court has stated, "If, as here, the prosecution can show that the accused was aware of his right to have his counsel notified and present at the interrogation, but that he affirmatively waived those rights, then a valid waiver under M.R.E. 305(g)(1) can be found." *LeMasters,* 39 M.J. at 492. This case fits that circumstance, and, thus, this assignment of error is without merit.

## AOE VI

### Improper Government Peremptory Challenge

In his next assignment of error the appellant asserts that the military judge erred in accepting the trial counsel's reason for peremptorily challenging a member of the same race as the appellant. We disagree.

Our superior Court has laid out the framework for analyzing such an issue. In *United States v. Chaney,* 53 M.J. 383 (C.A.A.F.2000), the Court stated:

Neither the prosecutor nor the defense may engage in purposeful discrimination on the basis of race or gender in the exercise of a peremptory challenge. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69[ ] (1986); *J.E.B. [v. Alabama, ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)]; *United States v. Moore,* 28 M.J. 366 (CMA 1989); *United States v. Witham,* 47 M.J. 297 (1997). There is a specific procedure in the military justice system for examining allegations of purposeful discrimination in the exercise of peremptory challenges, as noted by the court below. [*United States v. Chaney,*] 51 M.J. [536,] at 538 [ (A.F.Ct.Crim.App.1999) ].

If one party believes that the other party has exercised a peremptory challenge against a member of a cognizable group (i.e., based on race or gender), the party opposing the challenge must object and state the basis of the objection. *See Moore, supra* at 368. The party making the challenge is then required to offer a reason for the challenge that is neutral in terms of race or gender, as applicable. *Id.*

The military judge must "review the record and weigh ... the credibility [of the counsel making the peremptory challenge] before ... [the judge] makes a factual determination regarding the presence or absence of purposeful discrimination in the panel member's rejection." *United States v. Greene*, 36 M.J. 274, 281 (CMA 1993). The peremptory challenge will be sustained unless the proffered reason is "unreasonable, implausible, or ... otherwise makes no sense." *United States v. Tulloch*, 47 M.J. 283, 287 (1997). On appeal, the military judge's determination on the issue of purposeful discrimination is given great deference because it is based primarily upon the judge's personal evaluation of the credibility of the counsel making the peremptory challenge. The military judge's determination of purposeful discrimination will be overturned only if it is clearly erroneous. *United States v. Greene*, 36 MJ 274, 281 (CMA 1993).

*Chaney*, 53 M.J. at 384–85.

In the appellant's case, the Government initially made a challenge for cause against Captain (Capt) L, U.S. Marine Corps, based on the fact he had previously been a criminal accused in a military justice case and, therefore, would likely hold the Government to a higher standard of proof than required by law. The military judge, however, denied the Government's challenge for cause. The Government then exercised a peremptory challenge against Capt L. As Capt L is the same race as the appellant, defense counsel objected, based on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and argued that trial counsel was required to articulate a race-neutral reason for the challenge. Trial counsel articulated the following race-neutral reason for the challenge:

> For the same reason that I made the challenge for cause, sir. The man has been an accused in a court-martial. As much as he may identify with the accused and hold the government to an impossibly high burden in this case as a result of his

identification with the accused rather than as an impartial member of the jury, sir. Record at 1626.

The military judge made the following findings:

> The government's peremptory challenge against Captain L[ ] is granted. Let me say that I am fully convinced that the government has stated a completely race-neutral basis for its peremptory challenge against Captain L[ ].
>
> While I appreciate the fact that the defense may not share the fear that Captain L[ ] will hold the government to an impossibly high standard of proof on the case, it does seem to me that the focus of the challenge for cause [sic] is not Captain L[ ]'s race, but rather Captain L[ ]'s prior experience of having faced criminal charges himself in a criminal proceeding, and the government's fear that the experience may cause him to require the government to meet a completely unacceptable burden of proof that is far more than the law actually requires. It seems to me that that's a perfectly reasonable tactical basis for the government to make a challenge for cause [sic] against Captain L[ ].
>
> **I am also fully convinced that the government counsel is being entirely sincere and honest when he says that his concern is not Captain L[ ]'s race but rather Captain L[ ]'s prior experience as a criminal defendant facing criminal charges in the military justice system,** and so under the circumstances the government's peremptory challenge against Captain L[ ] is granted.

Record at 1628–29 (emphasis added).

In essence, the appellant's argument is that the facts of the case suggest that the exercise of the peremptory challenge for this member did not make sense given the fact that a more appropriate challenge could have been used against a third member.[5] Considered another way, the appellant seems to suggest that error may be found where trial counsel, with legitimate reasons to use its

---

5. Another member was the trial defense counsel's neighbor. This member acknowledged that he and the defense counsel had discussed cases like this, in general, and discussed how difficult they are to prove. The trial counsel sought to have this member challenged for cause as well, but the military judge denied the challenge.

peremptory challenge on more than one member, challenges the member that may have been more favorable to the accused.

We find that the appellant has failed to show that the military judge's decision was clearly erroneous. Since the military judge found the trial counsel's reason to be race neutral, reasonable, plausible, and otherwise made sense, the military judge properly granted the peremptory challenge. *Tulloch,* 47 M.J. at 287. "The military judge's determination that the trial counsel's peremptory challenge was race-neutral is entitled to 'great deference' and will not be overturned absent clear error.'" *United States v. Hurn,* 58 M.J. 199, 201 (C.A.A.F.2003)(quoting *United States v. Williams,* 44 M.J. 482, 485 (C.A.A.F.1996)). We hold that the military judge's ruling was not clear error. Additionally, the fact that trial counsel had previously articulated the reason as a challenge for cause added to its credibility as being the actual reason for the challenge. The assignment of error is without merit.

### AOE VII

### Appellant Denied Conflict–Free Defense Counsel

■ In the appellant's next assignment of error, he alleges that he was denied his right to conflict-free counsel, when the military judge failed to secure a waiver for the alleged conflict that was voluntary, knowing, intelligent, and done with sufficient awareness of the relevant circumstances and likely consequences. The appellant bases his position on the fact that the trial defense counsel, Capt A., USMC, "was pending charges" and likely facing an Article 32, UCMJ, investigation at the time the appellant's trial began.[6] The charges would have been referred by the same convening authority who referred the appellant's case to a general court-martial.

An appellant is "entitled to have conflict-free counsel." *United States v. Murphy,* 50 M.J. 4, 10 (1998)(citing *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426[ ] (1978)). If a conflict of interest involving the accused's counsel arises during trial, the judge must resolve

the matter on the record. *United States v. Breese,* 11 M.J. 17, 20 (C.M.A.1981). The judge should inquire of the accused whether: (1) He has been advised of his right to effective representation; (2) He understands the reasons for his attorney's possible conflict of interest and the dangers of the conflict; (3) He has discussed the matter with his attorney, or, if he wishes, with outside counsel; and (4) He voluntarily waives his Sixth Amendment protection. 11 M.J. at 22 (citing *United States v. Davis,* 3 M.J. 430, 434 (C.M.A.1977)). *Accord United States v. Lindsey,* 48 M.J. 93, 98 (1998). *See also,* Rule for Courts Martial (R.C.M.) 901(d)(4), Discussion. "[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *United States v. Hicks,* 52 M.J. 70, 72 (1999)(citing *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333[ ] (1980), *quoted in Breese,* 11 M.J. 17, 20 (C.M.A.1981)). We may resolve this assignment of error using the appellant's own expression of satisfaction with his counsel. *United States v. Ginn,* 47 M.J. 236, 248 (1997).

*United States v. Dorman,* 57 M.J. 539, 543 (A.F.Ct.Crim.App.2002)

We first note that the appellant has failed to show that an actual conflict of interest existed. While the focus of the conflict hearing was on the appellant and Capt A having the same convening authority for their court-martial and potential court-martial, respectively, we have never been provided with any evidence that Capt A was ever court-martialed. During the hearing, it was presented that while charges had been **preferred** against Capt A, and might result in an Article 32, UCMJ, hearing, the charges against Capt A had not yet been referred to trial by court-martial. Only if the general court-martial convening authority, in fact, decided to refer the charges of Capt A to a court-martial, would the appellant and his counsel have the same convening authority.

Next, we note that the military judge, in substance did, in conjunction with Capt A's

---

6. *See* Appellate Exhibit 2 (sic); Record at 5; 19– 27.

assertions on the record in court, advise the appellant of his rights, the ramifications of a potential conflict, and secure a valid waiver. Amongst the issues discussed in the presence of the appellant were the relationship between the appellant's charges and those of his attorney, the crossover of witnesses, and potentially having the same convening authority. Not only were the issues discussed, but potential impact upon the appellant's case was also delved into. During the conversation, the military judge asked the appellant if he still wished to be represented by Capt A as his attorney. At the end of the hearing the military judge asked the appellant:

> MJ: ... Staff Sergeant Allen, you have heard everything that has gone on this morning?
>
> ACC: Yes, sir.
>
> MJ: Do you have any questions about anything that I have discussed with counsel for either side in your presence this morning?
>
> ACC: No, sir.
>
> MJ: Do you still want to be represented by Captain [A.]?
>
> ACC: Yes, sir.
>
> MJ: Do you desire to be represented by any other attorney, either military or civilian?
>
> ACC: No, sir.

Record at 27. Thus, we find that no actual conflict has been established. Even if we were to assume an actual conflict of interest, the hearing conducted by the military judge in the presence of the appellant and the appellant's subsequent statements on the record indicate that a valid waiver was secured from the appellant.

## AOE VIII

### Charges I and II Are an Unreasonable Multiplication of Charges

In his eighth assignment of error, the appellant asserts that the charging of a maiming offense and the lesser included offense of

7. Appellant's Brief of 12 Jul 1999 at 40–42.

8. Charge I (maiming CJ on 7 and 8 August 1996 by shaking him) and Charge II (assaulting CJ on

assault intentionally inflicting grievous bodily harm constitutes an unreasonable multiplication of charges (UMC) warranting a dismissal of the assault charge. While the appellant labels his assertion as a UMC issue, he talks about multiplicity as well in his appellate brief.[7] It is with this last factor—the *multiplicity* of the charges—that we agree with the appellant.

 While not finding a UMC problem, we do conclude that the two offenses are multiplicious. Our superior Court has consistently held that "[o]ffenses are multiplicious if one is the lesser-included offense of the other." *United States v. Palagar,* 56 M.J. 294, 296 (C.A.A.F.2002); *accord United States v. Frelix–Vann,* 55 M.J. 329, 331 (C.A.A.F.2001); *United States v. Weymouth,* 43 M.J. 329, 340 (C.A.A.F.1995); *United States v. Foster,* 40 M.J. 140, 146 (C.M.A. 1994). We find that the assault intentionally inflicting grievous bodily harm is a lesser-included offense of the more serious crime of maiming the baby. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, ¶ 50d(3).

The military judge found the two offenses multiplicious for sentencing, and after the members found the appellant guilty of *both* maiming and of the assault intentionally inflicting grievous bodily harm, he instructed the members for sentencing purposes as follows:

> The offenses alleged in the specifications of Charge I and II are multiplicious. That is the offenses which are alleged to have occurred on the 7th and 8th of August 1996 are all part of one transaction. Therefore, in determining what would be an appropriate sentence in this case, you must consider the fact that in essence, you are dealing with only one offense rather than two since they are multiplicious for sentencing consideration.

Record at 3007.[8]

Thus, the members only considered the one greater offense for sentencing purposes,

7 and 8 August 1996 by shaking him) both involved one act or consecutive acts and not a course of conduct comprising numerous acts over a 2–day period.

with the military judge instructing them that the maximum permissible punishment for maiming included 7 years of confinement and a dishonorable discharge. Record at 3007. The appellant was sentenced to a bad-conduct discharge and 1–year confinement. *Id.* at 3016.

We believe—based on the facts of this case—that, while the Government might have had a legitimate charging scheme for contingencies-of-proof concerns, once all the evidence had been presented, or after findings, as appropriate, the military judge, *sua sponte,* should have dismissed Charge II and its sole specification alleging the assault intentionally inflicting grievous bodily harm. We shall take corrective action below.

## AOE IX

### Government Failed to Provide Appellant Critical Documents and Witnesses

■ In this assignment of error, the appellant asserts that he was denied a fair trial by the Government's failure to provide him with certain documents. We disagree. The appellant initially argues that the Government failed to provide him with a verbatim transcript of the Article 32, UCMJ, hearing. However, neither the UCMJ, nor the Rules for Courts–Martial require that a verbatim record be made of testimony taken during an Article 32 investigation. *United States v. Matthews,* 16 M.J. 354, 362 (C.M.A.1983); *see also* R.C.M. 405(j); R.C.M. 405(h), Discussion ("The investigating officer is required to include in the report of the investigation a summary of the substance of all testimony."). Here, the military judge denied the appellant's motion for a verbatim transcript, instead ruling that where the appellant could show that he needed a verbatim transcript of a particular witness' testimony, the court would order the transcription of that particular witness' testimony. Later, the military judge did as promised, and at the appellant's request, ordered that certain portions of a witness' testimony be transcribed. Under these circumstances, the appellant has failed to demonstrate that the lack of a verbatim transcript of the entire Article 32, UCMJ, investigation prejudiced him in any manner.

■ Next, the appellant asserts that the failure of the Government to provide him with Prosecution Exhibit 34, an amended medical report, until the day the trial counsel offered it into evidence, denied him a fair trial. R.C.M. 701(a) provides that trial counsel shall provide such information to the defense "[a]s soon as practicable," and R.C.M. 701(d) provides that the duty to disclose is a continuing obligation. Possible remedies for failure to comply with these obligations are to order the party to permit discovery, grant a continuance, exclude the evidence, or enter an order that is just under the circumstances. R.C.M. 701(g)(3). Factors to be considered in determining whether to exclude the evidence include: (1) the extent of disadvantage that resulted from the failure to disclose; (2) the reason for the failure to disclose; (3) the extent to which later events mitigated the failure to disclose; and (4) any other relevant factors. R.C.M. 701(g)(3), Discussion.

Here, the record shows that the trial counsel did not receive the amended report *until* the very day he moved to admit the document. It also shows that the re-examination that led to the amended medical report was done at the request of the appellant. Thus, the appellant was on notice that there could be an amended report. When this issue presented itself, the military judge ordered the discovery and granted the appellant a remedy of a 2–day continuance. Under the circumstances, we conclude that this was an appropriate remedy that ensured the appellant had adequate time to address the evidence. Moreover, the findings in the appellant's case make this item of evidence moot. The information in the amended report to which the appellant objected was evidence of rib fractures found in March 1996. The appellant was **acquitted** of the charge relating to the March 1996 injuries to his child. Since the appellant has not demonstrated how this evidence affected the findings, and the appellant was given a 2–day continuance as a remedy, the appellant suffered no prejudice.

Finally, the appellant alleges that the Staff Judge Advocate for Tripler Army Medical Center "tried to" prevent him from gaining

access to files. The appellant, however, was given copies of those documents, and, subsequently, the military judge ordered that he be given access to the original files. The appellant suffered no prejudice regarding these medical records. This assignment of error is without merit.

## AOE X

**The Evidence Is Factually And Legally Insufficient To Prove Either Maiming Or Aggravated Assault Beyond A Reasonable Doubt**

 In the last assignment of error, the appellant challenges both the legal and factual sufficiency of the evidence upon which he was convicted. We conclude that the evidence was legally and factually sufficient.

This court's standard of review for sufficiency of the evidence is set forth in Article 66(c), UCMJ:

(c) In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Further, this standard and its application have been recognized and defined by the Court of Appeals for the Armed Forces:

[U]nder Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of [Criminal Appeals] has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987).

In making such factual determinations, we are guided by the principle that:

Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). So, too, may we. Art. 66(c), UCMJ.

*United States v. Lepresti*, 52 M.J. 644, 648 (N.M.Ct.Crim.App.1999). It is with these standards of review that we now examine the evidence established in this case.

In March 1996, the appellant and his wife were the parents of a 3–month old child, CJ. Mrs. Allen and the child had just returned to Hawaii from a visit to Maryland, where Mrs. Allen and the child stayed with and visited family and friends. On the evening of 6 March 1996, CJ and his mother returned home. Mrs. Allen took a shower about 2145, leaving CJ alone with the appellant. At 2159 hours, the appellant called "911" to report that his son was in a semi-conscious state and was having trouble breathing. Emergency Medical Technicians (EMT) responded at about 2222 and transported CJ to Kapiolani Medical Center at Pali Momi. EMT personnel reported that Mrs. Allen's hair appeared to be wet, corroborating that she had been in the shower, leaving the appellant alone with the child immediately prior to the child's distress.

CJ was examined at Kapiolani Medical Center. He was later admitted to Tripler Army Medical Center at about 0200 7 March 1996. CJ had spinal fluid withdrawn at about 0300 on 7 March. Spinal fluid is typically clear. Since CJ's spinal fluid was observed to be straw colored, Dr. Dully indicated that there had been bleeding into the spinal column. She indicated that generally

it takes between 3 to 6 hours for blood to turn the spinal fluid from clear to straw colored. This would then suggest that CJ was injured at a time when the appellant had been alone with the child. CJ was found to have subdural and retinal hemorrhages. The appellant was advised that these injuries are caused by a shaking of the baby, or a fall from a significant height.

As a result of these injuries to CJ, child abuse was suspected. Due to the fact that the child and mother had been in Maryland and away from the appellant for a period of time before the injuries were observed, Mrs. Allen was initially regarded as the likely suspect. The state of Hawaii initiated a child-protection action. Mrs. Allen was removed from the home and was not permitted to be the childcare provider. She was permitted only supervised visitation. The appellant was the parental supervisor. He had sole custody of the child. Other than childcare for work purposes,[9] the appellant had almost exclusive care and control of this child.

On 8 August 1996, CJ again suffered very serious medical distress. At the hospital, he was having trouble breathing and appeared unconscious. The staff at the hospital found that CJ had a skull fracture in the front of his skull, a left rear subdural hemorrhage, a left front subdural hemorrhage, a subgaleal hemorrhage, subarachnoid hemorrhages, and hemorrhages of both retinas. There were numerous medical professionals called as witnesses at the court-martial who testified about this child's diagnosis and the cause of his injuries.

Maj Pedersen, an Army doctor, who was a child neurologist in the pediatrics department at Tripler Army Medical Center, indicated that the injuries CJ sustained were not caused by simply a single impact event. Rather, they were indicative of an acceleration/deceleration type injury, such as one sees in non-accidental trauma. Shaking of the baby could have caused these injuries, particularly the massive retinal hemorrhaging in both eyes and the injury to the brain

on the opposite side of the brain from the fracture.

Maj Peterman, an Army doctor and Chief of Neuroradiology at Tripler, also indicated that CJ's injuries were consistent with abuse of the child and indicated a shaking causation. He testified specifically that CJ's injuries were inconsistent with a simple fall from about 4 feet off the ground, the explanation advanced by the appellant. He too corroborated the acceleration/deceleration causation for CJ's injuries.

LCDR Dully, a Navy pediatrician who specializes in abuse cases, indicated that shaken-baby syndrome was the only reasonable explanation for CJ's injuries, short of a fall from a multiple story building or a horrific auto wreck. Since these events were known not to have occurred, that left abuse as the only reasonable explanation.

CAPT Craig, a Navy doctor at Bethesda and a pediatrician with a focus on abuse and neglect cases, testified that CJ's injuries were not consistent with a fall to the floor from his arms, as described by the appellant. Severe brain injury as sustained by this baby does not result from a 4-foot fall. Nor are bilateral retinal hemorrhages caused by this type of fall. Rather, these types of injuries are the result of rapid acceleration/deceleration, such as would occur in a violently shaken baby.

Maj Blaydon, an Army staff ophthalmologist at the Tripler Army Medical Center, indicated that the child sustained severe retinal hemorrhages to both eyes. Like the other medical professionals, he also indicated that CJ's injuries were caused by rapid acceleration/deceleration.

Maj Burton, an Army doctor called by the appellant, indicated that his number one diagnosis as to the cause of CJ's injuries in August was child abuse.

In short, nearly all the medical professionals that testified about CJ's injuries indicated that abuse was the most likely cause of his injuries. Shaking of the baby was reported

9. There is no evidence in the record suggesting that any child-care provider outside the family abused or injured CJ in any way.

to be the mechanism by which most of the injuries could be explained. There were, as articulated by the appellant, some disagreements between some of these witnesses as to the importance of the lack of secondary injuries, the weight to be given certain of the physical findings, and the impact upon the child of rotational versus linear impacts. We are reminded however, that reasonable doubt does not mean free from conflict. *Lips*, 22 M.J. at 684. This Court, like the panel members at the court-martial, is free to believe some of the testimony of a witness and not other aspects of the testimony. *Lepresti*, 52 M.J. at 648 (citing *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979) and Art. 66(c), UCMJ). Thus, while there may be conflicts in the medical testimony, as to matters peripheral to the ultimate issue, this alone does not constitute reasonable doubt.

We acknowledge, however, that this does not end the inquiry. Even if the Government's burden has been met in proving that CJ was maimed and grievously injured, the appellant's identification as the person causing this harm must be proven before we can sustain the conviction.

Obviously, the appellant's statement to NCIS is inculpatory in that he admits to shaking the child. We have upheld the trial court's ruling that this statement is admissible. While the statement cannot be characterized as a complete confession, the appellant does admit that he shook the child. This admission is consistent with the great weight of the medical testimony, that shaking was the mechanism, which was the likely cause of most of the injuries. This admission, together with all the other evidence, satisfies us, beyond a reasonable doubt, that the evidence is legally and factually sufficient to prove all the elements of the offenses.

Even if we were to disregard the appellant's statement, the remaining evidence is still sufficient to affirm the conviction. The appellant was found not guilty of the charge of assaulting his son in March 1996. However, as a result of the injuries CJ sustained in March, the appellant's wife was ordered out of the home. The appellant thereafter became the sole caretaker of the child. Thus, the appellant was in a position to be alone with the child, completely unsupervised for virtually all of the time from then until August 1996, when the child was again abused. The appellant had not only the ability to commit this crime, but he had almost exclusive opportunity to do so. This exclusivity of access, coupled with the overwhelming weight of the medical testimony, convinces us that the appellant was the actor that caused the grievous injuries to CJ.

This also does not end our inquiry, however, as the appellant's intent must be considered. Turning to the appellant's intent, we first note that the intent to inflict great bodily harm may be established through circumstantial evidence. *United States v. Littlehales*, 19 M.J. 512, 516 (A.F.C.M.R.1984), *aff'd*, 22 M.J. 17 (C.M.A.1986), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986). "When grievous bodily harm has been inflicted by means of intentionally using force in a manner likely to achieve that result, it may be inferred that grievous bodily harm was intended." MCM, Part IV, paragraph 54c(4)(b)(ii)(1995 ed.).

The prosecution clearly established that CJ's injuries were caused by forceful, repetitive shaking or shaken-baby syndrome. They were not caused by accident. The removal of the appellant's wife from the home in March 1996, not only gave the appellant almost-exclusive opportunity to commit the crime, but suddenly put him in a role to which he was not accustomed. This change in household make-up and responsibility certainly might have taken its toll on the appellant. This, together with an ongoing investigation and new demands imposed by the child-protective services on the family inevitably lead to an ever-increasing burden on this already-troubled family situation. In addition, from CJ's injuries in March and the resulting treatment and investigation, the appellant became well aware (if he had not been before) of the causative connection between shaking, or violent repetitive force being applied to, infants and the resulting serious brain injuries.

We are satisfied that the appellant understood the severe harm that could be caused by shaking his child or by otherwise subjecting him to a violent force. We are convinced

beyond a reasonable doubt that the appellant assaulted his son with intent to commit grievous bodily harm, resulting in permanent injury to the child's brain, partial blindness, and mental retardation.

### Conclusion

Accordingly, we set aside the findings of guilty for assault by intentionally inflicting grievous bodily harm and dismiss Charge II and its sole specification. We affirm the remaining findings. In conducting reassessment of the sentence, we are guided by the principle that in reassessing a sentence, the task of this Court differs from that which it performs in the ordinary review of a case. Under Article 66, UCMJ, we must assure that the sentence adjudged is appropriate for the appellant and for the offenses of which the appellant has been convicted. If the sentence is excessive, we must reduce the sentence to make it appropriate. However, when prejudicial error has occurred in a trial, not only must we assure that the sentence is appropriate in relation to the affirmed findings of guilty, but we must also assure that the sentence is no greater than that which would have been imposed if the prejudicial error had not been committed. *United States v. Peoples,* 29 M.J. 426, 428 (C.M.A. 1990); *United States v. Sales,* 22 M.J. 305, 307–08 (C.M.A.1986); *see also United States v. Cook,* 48 M.J. 434, 438 (C.A.A.F.1998).

Having reassessed the sentence, we affirm the adjudged sentence as approved below. We conclude that such a reassessed sentence is appropriate for the offenses, and the offender, and that such an affirmed sentence is no greater than would have been awarded by a general court-martial for the very serious offense of maiming one's baby. This is particularly so when considering, as discussed above, the military judge's instruction to the members that the two offenses—maiming and assault intentionally inflicting grievous bodily harm—were multiplicious for sentencing, and that they should consider only the maiming offense for sentencing purposes. Thus, the members reached an appropriate sentence solely for the maiming offense. A supplemental promulgating order shall be prepared consistent with the decision of this Court.

Senior Judge PRICE and Senior Judge CARVER concur.